(No. 42992.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. HAROLD W. PITTMAN *et al.*, Appellants.

*Opinion filed September 25, 1973.*

40

PAUL BRADLEY, Deputy Director, and KENNETH L. JONES, Assistant District Defender, Illinois Defender Project, both of Chicago, for appellants.

WILLIAM J. SCOTT, Attorney General, of Springfield, and ROBERT H. RICE, State's Attorney, of Belleville (JAMES B. ZAGEL and JOHN F. PODLISKA, Assistant Attorneys General, of counsel), for the People.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Following a jury trial in the circuit court of St. Clair County, defendants, Harold Pittman, Charles Williams and Will Mobley, were convicted of the murder of William

Langsdorf. Upon the jury's recommendation each was sentenced to death. The defendants appeal directly to this court (50 Ill.2d R. 603) raising numerous issues, hereinafter specifically enumerated, which they assert require reversal of their convictions. They further challenge the validity of the punishment imposed.

On Tuesday, March 11, 1969, the body of William Langsdorf, a truck driver for Associated Groceries, was found under a viaduct of an interstate highway in East St. Louis, Illinois, and defendants, together with Ronald Dansberry and Curtis Spencer, were indicted for this murder. Dansberry pleaded guilty before the same trial judge prior to defendants' trial and was awaiting sentencing. Spencer was still a fugitive, although the record indicates that he later was apprehended and pleaded guilty.

Dansberry, called by the State, testified that he knew Williams and Pittman because they had attended a vocational training program together with Mobley, with whom he had been acquainted for 15 years. Spencer was his brother-in-law. Dansberry and Spencer were working on the former's car about noontime on March 11, 1969, when these defendants arrived in a 1965 white Chevrolet driven by Pittman. All were at his house for about 1 to 1½ hours where they talked and drank. During this time Dansberry claimed that he showed the defendants a loaded .32-caliber Arminius revolver (which could hold seven cartridges). It was later established this weapon had been purchased less than two months prior thereto. All left in Pittman's car and drove to the vicinity of the Ohio Market in East St. Louis, where an Associated Groceries' truck was parked in the lot. Dansberry believed Spencer said he was going "to get" the truck in which a driver appeared to be asleep. At this point Dansberry was asked to refresh his recollection by reading his statement previously given to police.

Thereafter Dansberry testified that Pittman drove the car around the corner where the market was located and toward a nearby park where Spencer got out, taking the

.32 revolver with him. Mobley also alighted from the vehicle. No one at this time mentioned a knife and Dansberry said he did not know if Williams or Mobley knew of Spencer having the gun. He again read his statement to refresh his recollection concerning whether anything was said about a knife, but he still could not recall this matter. At this juncture the State made a motion to declare Dansberry a hostile witness; the motion was granted, and the State was permitted to cross-examine.

Dansberry then testified that someone mentioned that the truck driver might have money. Within a short time the grocery truck was driven from the lot by Spencer accompanied by Mobley. Pittman, Dansberry and Williams followed in the car.

After passing the truck Pittman made a U-turn and stopped. The front license plate of the car then was bent down and the rear plate covered with a paper sack in order to diminish the possibility of vehicle identification. Thereafter Pittman drove to a dirt road and they got out. Williams pointed to the location of the truck and they proceeded in that direction. Dansberry returned to the car, however, at Williams's suggestion.

Dansberry then drove Pittman's car to another street, got out and walked to the corner. As he looked toward the parked truck, he observed Spencer and the defendants walking quickly toward him. He returned to the car and picked them up. As he was driving, someone in the car mentioned that the truck driver might be dead because Mobley said the victim was shot four or five times. The car was stopped in order to uncover the license plates and Pittman then took over the driving. Williams gave Danberry the empty revolver. Someone mentioned that the victim had only six dollars, which was later divided. He said that someone handed him a yellow type white gold wedding ring which he knew did not belong to any occupant of the car. This item was subsequently discarded. The revolver was eventually given to Spencer and apparent-

ly had not been recovered at the time of the trial. Dansberry and Mobley later decided to fabricate a story as to their whereabouts at the time of the shooting and Pittman agreed to join in this.

During defense examination of Dansberry, he admitted that he had been afforded the privilege of having his breakfast brought to the jail by his sister-in-law. He denied discussing his testimony or sentence with the prosecution and further stated that no promises of leniency had been made to him by the prosecution in return for his testimony, although he said that his attorney had told him of such possibility.

Patricia Langsdorf, the victim's wife, testified that they had three children. She said that on March 11, 1969, he was wearing a wedding ring identical to her own and she described it as made of gold with a band of florentine and tiny strips of silver on either side. She further stated that it was her husband's custom to begin each week with ten dollars which he would use for his personal expenses. Several items of torn, bloodstained clothing and a jacket with holes in the back were identified by her as belonging to her husband. Defense objections to exclude these items were overruled.

Ed Houston, the manager of the Ohio Market, testified that he purchased groceries from Langsdorf's employer. He said that his store closed every day between 1:00 and 2:00 P.M. for the employees' luncheon convenience. On March 11, 1969, the normal delivery day, Houston said that Langsdorf arrived shortly before 1:00 P.M. but because the store was closing no one was there to aid in unloading the truck. This witness testified that as he left he saw Langsdorf sitting in the truck but upon his return at 2:00 P.M. the vehicle was gone.

Omar Troland, a former grocer who had done business with Associated Groceries, testified that he now was employed by a real-estate firm. In conjunction with his

present occupation he said he was in the vicinity of the Ohio Market after 1:00 P.M. on March 11, 1969. He noticed a truck in the parking lot and drove toward it because he said he thought he might meet a driver he knew. However, he did not recognize the two Negroes in the truck as it was driven away.

Herbert Shaw, an employee of Associated Groceries, testified as to an instrument known as a tachograph which was in the cab of the victim's truck. He explained that this device measures the speed and time during which the truck moves. He interpreted the graph as indicating that the vehicle was stopped shortly before 1:00 P.M. on the day of the murder and was moved about 1:40 P.M. for several minutes. The next movement took place at 4:35 P.M., after Langsdorf's body was discovered by police. Shaw and two other employees also testified as to the discovery of a bullet in the cab of the vehicle several days after the shooting. This bullet was given to the police.

Louise Jennings, who lived near the viaduct, said she saw a grocery truck drive by her house and about 1:30 P.M. saw a white 1965 Chevrolet parked on the road just below her house. She further stated that four youths ran from the direction of the bridge toward that car and that the group consisted of three Negroes and one white male who were talking and looking back toward the bridge. She described the white youth as having a beard and sideburns and wearing a leather jacket. The State then asked her if she could identify the white youth. Counsel for Williams objected, and a side bar conference was held. She did not identify anyone on direct examination. On cross-examination the witness was asked about a statement she gave to the police, and at this time another side bar conference was granted at the request of the State and a recess held. Thereafter, she was further questioned by other defense counsel and finally identified Pittman, during cross-examination by Mobley's attorney, as the white man

because of the structure of his nose and his glasses. She said that as she stood by her door Pittman walked by about 15 feet from her on his way to the car.

Grady Lockett, a garbage-truck driver, testified that he parked his vehicle near the viaduct during his lunch break. He said he saw a truck under the viaduct and three or four people running from it, one of whom he described as light skinned and the others definitely as Negroes. He further observed a white Chevrolet being driven from the area. He could not specifically identify anyone because of the distance (300-400 feet) between the grocery truck and his vehicle.

Jeff Haire, another area resident, testified that at about 1:30 P.M. he saw a white Chevrolet in the vicinity. He said it contained one white and two Negro men. His attention was attracted to the vehicle when it was stopped and one of the Negroes placed a "newspaper or something" over the rear license plate before it was driven away. He believed that Pittman was the white man, whom he described as having a beard and sideburns.

Dr. Clifford Kane, the county coroner, performed an autopsy on Langsdorf and recovered three bullets. He described in detail the results of his examination, stating that the victim had facial lacerations and a recent head wound which he believed was caused by a blow from a blunt instrument. He said the victim had been shot six times. One bullet had entered and exited from the right arm. Another had struck him in the hip. A third bullet had lodged in the right shoulder. He was also shot in the lower part of the back with the bullet traveling in an upward direction through the liver, lung, large blood vessels and heart before lodging beneath the sternum. A fifth bullet had entered from the back, piercing a lung and exiting from the chest. There were also two wounds in the abdomen apparently caused by one bullet which pierced several blood vessels before exiting. Dr. Kane was of the opinion that any one of three shots could have caused

death and that the bullet which entered the lower portion of the back may have been fired as the victim was bending over.

Detective Joseph Brasser, a ballistics expert, testified that he had examined the bullets given him in connection with this case. He said they were .32 caliber and from the distinctive characteristic markings found thereon may have been fired from an Arminius revolver.

Sergeant Bruce Morrison of the East St. Louis Police Department testified that at 2:45 A.M. on March 18, 1969, he and other officers arrested Pittman at his home and seized a leather jacket. A pile of hair was found on the floor. Morrison also testified, without objection, that during a conversation Pittman admitted he had recently shaved off his beard and Pittman's wife said she had just given him a haircut.

Sergeant James Borsis testified that he arrived at the scene of the murder at 3:30 P.M. He noted the victim lying face down approximately 35 feet from the front of the truck. He said the vehicle was found about .8 mile from the Ohio Market. Three bullets were recovered by him. Borsis further stated that on March 21, 1969, he went to Will County, where Williams had been detained by the sheriff's police. In the presence of Williams these officers gave Borsis a knife which it was claimed had been taken from Williams, who did not deny ownership at that time.

Four typewritten confessions were admitted into evidence by the State over defense objections. Two of these were taken from Williams on March 22 and March 24, 1969, respectively. The former (four pages) bore Williams's signature in five places, the latter (seven pages) was signed eight times. Mobley's statement (five pages), taken on March 20, 1969, was signed six times. Pittman's statement (six pages), taken on March 18, 1969, was signed seven times. Borsis denied that any material contained in the statement was supplied by the police but said all matters contained therein were given by the

defendants. On cross-examination defense counsel asked Borsis about his testimony which he had given a week prior to trial (in the hearing held to suppress these statements). The State interjected that it would be proper to obtain a transcript of the prior proceedings. The trial court, in order to clarify this discussion, explained to the jury that a prior hearing had been held to determine if the confessions were admissible and it had held them to be so. The court explained that this was the testimony to which defense counsel was alluding. Defense objections to this explanation were overruled.

Each confession is in narrative form. The declarants are in basic agreement as to the facts which occurred before and directly after the shooting and substantially confirm much of Dansberry's recollection of the incident. However, each declarant disclaims actually having fired the shots and attempts to establish what might be described as a passive participation on his part in the actual shooting.

In Williams's statement given on March 22, 1969, he says he gave a knife to Mobley while all were in Pittman's car prior to the shooting. This knife was the one taken from him when he was arrested in Will County. He claims that when they initially saw the grocery truck someone had said money could be obtained. He further indicated that as he approached the truck, when it was parked under the viaduct, he heard several shots and observed the victim struggling. At this point he said that he ran for the car. Williams's supplementary statement is similar except for the fact the names of the other participants have been deleted and their general descriptions substituted.

Mobley's statement avers that he obtained Williams's knife while all were in Pittman's car prior to the incident. He said he produced the knife when he and Spencer initially confronted the victim. In describing the events which transpired under the viaduct, he said that Spencer hit the victim over the head with the gun when the latter

was unable to produce enough money and during the ensuing struggle Spencer shot the victim twice. Mobley asserted that he was attempting to get out of the truck cab when Pittman grabbed the victim and began punching him in the face and then Williams took the weapon from Spencer and fired four shots at the victim as he attempted to flee.

In Pittman's description of the events he asserts that as he approached the truck he heard two shots and viewed Mobley grasping the victim with one hand and holding Williams's knife in the other. He said that Williams took the gun as the victim began to plead for his life but at this point Pittman claimed that he stepped between the victim and Williams and suggested that they leave. Upon orders from Mobley and Williams, however, he moved aside and Williams shot the victim several times.

Defendants did not testify. Various witnesses were called on their behalf and testified as to their good character and peaceful reputation. Pittman's mother-in-law and father-in-law further said that he did not have a beard prior to the murder.

Defendants now contend that their confessions were improperly admitted for they were obtained in violation of *Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.* The court held a hearing and denied their motions to suppress these statements. No contention is raised that all who witnessed the statements were not available to testify. *People v. Armstrong, 51 Ill.2d 471.*

Two matters are of preliminary consideration to our discussion. First, each of the confessions admitted at trial was transcribed on what would appear to be a standard police statement form. On the top of the first page of each statement is a paragraph detailing the *Miranda* warnings and defendants' signatures appear thereunder. Each page of the respective statements bears the signature of the declarant and the police officers who witnessed it. Second-

ly, on appeal, defense counsel intimates that defendants are functional illiterates. Our examination of the record discloses no basis of support for this assertion.

At the hearing to suppress Pittman's confession it was established that he had given three statements only one of which was introduced at trial. The two statements not used were taken in the early morning hours on March 18, 1969, and in the afternoon of the following day. The statement used at trial was given on the evening of March 18, 1969.

The State introduced evidence which indicated Pittman was arrested at his home in Collinsville, Illinois, about 2:00 A.M. One of the officers who participated in the arrest said that Pittman was advised of the charge and of some of his *Miranda* rights although reference to an attorney was omitted at this time. Pittman was transported to East St. Louis and there, Officer Russell said, Pittman was fully advised of his rights and seemed to understand them. The police explained to Pittman that they were aware of his possible involvement and he agreed to give a statement. Prior to this first statement Russell said Pittman did not specifically ask for an attorney although it was made clear that he could have one. Russell stated he did not hear Pittman say he did not want an attorney.

This testimony was substantially corroborated by Sergeant Morrison who further stated Pittman specifically declined the advice of counsel at this time after he was told others had given statements. Pittman signed the first statement which, it is to be gathered from the record, contained the *Miranda* warning paragraph previously described. In the statement he did not admit the shooting. The interrogation lasted for over an hour, ending at 4:30 P.M. He was placed in his cell and was allowed to see his wife on two occasions that day.

The police again began to question Pittman at 7:50 P.M. that day, resulting in the statement introduced at trial. Sergeant Borsis stated that prior to the questioning

Pittman was fully advised of his rights and said he wanted to give a statement. He never indicated he did not understand his rights nor did he ever request an attorney. Borsis further stated Pittman was not threatened or coerced and that he read the statement before he signed it. During the interrogation several breaks were taken and the statement was completed shortly before midnight.

Pittman testified at the suppression hearing that about 1:30 A.M. on March 18, 1969, four police officers arrived at his house, told him of the charge and placed him under arrest. He disclaimed he was advised of his rights at this time but did say that upon his arrival in East St. Louis he was advised of his right to remain silent. He said no warnings were given to him prior to his second statement made later that evening. After his first statement was given, he was taken to the basement where his car was searched. Upon his return to his cell he slept for an hour and later was photographed and fingerprinted. He was then taken before a judge, although the present record is silent as to this matter. Thereafter, he returned to his cell where he remained awake because of his anxiety.

On cross-examination Pittman testified he could read and write and had attended school up to the eleventh grade, and thereafter went to trade school for 1½ years. Relative to his statement given on the evening of March 18, he claimed he signed it because he had been told if he did he could call his wife and go home. He said he had no knowledge of its substance because he did not read it and was not given the opportunity to do so.

Pittman now argues he did not expressly waive his rights. Specifically he asserts that the testimony of Officer Russell clearly established no positive waiver of his right to counsel prior to giving his first statement in which he did not mention the shooting. He contends that since this statement was not given in compliance with *Miranda,* the second statement introduced at trial suffers from the same infirmity and was therefore inadmissible. Officer Russell's

testimony that Pittman was fully advised of his rights prior to his first statement refutes this contention. As we have held, "An express waiver of the right to counsel is not necessary. \*\*\* Once the defendant has been informed of his rights and indicates that he understands those rights it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows his rights and chooses not to exercise them." (*People v. Brooks, 51 Ill.2d 156, 164; People v. Burbank, 53 Ill.2d 261, 266, cert. denied, 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017; People v. Torres, 54 Ill.2d 384, 393.*) Moreover, the testimony of Sergeant Morrison indicates Pittman declined counsel prior to giving his first account to the police.

Pittman also contends that because he lacked sufficient sleep he was in no condition to make a knowing and intelligent waiver of his *Miranda* rights. His argument is directed to the second statement which was introduced at trial. The record indicates that Pittman was placed in his cell on March 18, 1969, after giving the first statement and during that day was free from any police interference which may have occasioned loss of rest. This is merely another factor to be considered by the trial court in its determination of whether a statement is voluntarily given.

The trial court's decision as to the voluntary nature of a defendant's statement will not be set aside unless contrary to the manifest weight of the evidence. (*People v. Prim, 53 Ill.2d 62, 70, cert. denied, 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.*) After consideration of the totality of the circumstances, we do not find the trial court's ruling improper.

Pittman also argues, without citation of case authority, that the card from which his *Miranda* warnings were read, was not introduced into evidence as required by the best evidence rule. We find no merit to this assertion. Sergeant Morrison had this card with him at the time of the hearing and no defense request for its introduction into evidence was presented. Moreover, Officer Russell

stated the same warnings which appeared on the card were contained in the first paragraph of the statement forms.

Mobley argues the statement introduced against him at trial was a product of physical coercion. He further claims he was not properly advised of his rights and the card from which his rights were allegedly recited was not introduced into evidence.

Mobley's signatures were contained on four statements obtained between March 17 and 20, 1969. Sergeant Morrison, who participated in the first statement, testified that Mobley was fully advised of his rights and there were no promises or threats made before Mobley said he wanted to give a statement which, upon completion, he read. Officer Gregory Cox corroborated this testimony. Sergeant Borsis participated in the taking of the following three statements, one of which was introduced at trial. He stated that Mobley received the *Miranda* warnings and said that he understood. He denied knowledge that Mobley had been struck by Officer Batts, who did not participate in any phase of the interrogation. He did acknowledge the fact that Mobley had been taken to the hospital, which, he said, did not result from any beating.

Mobley claimed that prior to these four statements, he had given another and upon its completion had been approached by Officer Batts and accused of lying. He said Batts struck him in the stomach and he was taken to the hospital. He further claimed Batts knew he had trouble with his appendix and had been in the hospital on four prior occasions. He said that he never read any of the four statements before he signed them and that he had received insufficient warnings as to his rights. He also claimed the appendix attack for which he required hospital attention was caused by the blow from this police officer, although he did not tell anyone at the hospital of the incident.

Officer Robert Batts testified that he knew Mobley was hospitalized after complaining of pains in his side but he denied ever striking or coercing him in any manner. He

further disclaimed knowledge of the statements which Mobley gave.

The contentions as to physical coercion and the proper admonitions given Mobley are factual determinations which will not be set aside unless they are against the manifest weight of the evidence. (*People v. Hawkins, 53 Ill.2d 181; People v. Prim, 53 Ill.2d 62.*) We do not believe the trial court erred in holding these statements admissible. For the reasons previously expressed as to Pittman's contention we find no merit to the argument that the card containing the *Miranda* warnings should have been placed in evidence.

Williams contends both of his statements admitted at trial were obtained in clear violation of his *Miranda* rights after his initial refusal to give a statement upon being placed in custody in Will County. He asserts that this refusal renders invalid the product of any subsequent admission. Additionally, he maintains that his statutory rights were violated when he was not brought before a judge in Will County prior to being transported to East St. Louis. Ill. Rev. Stat. 1969, ch. 38, par. 109—2.

The testimony of Sergeants Borsis and Morrison indicates that Williams was informed of the charge and placed in their custody about 10:00 A.M. on March 21, 1969, and at this time Williams refused to say anything. He was driven to East St. Louis (a journey of several hours) and there incarcerated. The following afternoon Borsis told Williams their investigation indicated that he was involved. He fully advised Williams of his rights and Williams said he understood and wished to make a statement. Borsis denied there were any threats or promises made to Williams. Upon completion of the statement Borsis said Williams read it and then signed each page in the proper place. Officer Lawrence Henderson corroborated this testimony.

The second statement was obtained two days later under similar circumstances at the request of the State's

Attorney. This statement was given to Sergeants Borsis and Morrison and omitted reference by name to the co-defendants.

Williams testified that he had a ninth-grade education and was attending school in Joliet, Illinois, when arrested. He admitted he had lied when he first told the police his age. He admitted he signed both statements and that he was not beaten or threatened. Upon being asked if he wanted an attorney, Williams said he remained silent and then the questioning began. He claimed he did not understand everything Borsis had said concerning his rights and, although he read the *Miranda* warning at the top of the first page of the statement before signing, he said he did not fully comprehend its meaning. However, he admitted he understood what was contained in the statement.

Williams relies on *United States ex rel. Doss v. Bensinger (7th Cir. 1972), 463 F.2d 576, cert. denied, 409 U.S. 932,* and *United States v. Crisp (7th Cir. 1971), 435 F.2d 354, cert. denied, 402 U.S. 947,* to support his position that no interrogation should have occurred after he refused to speak while detained in Will County. Both these decisions are factually distinguishable from the present case. In *Doss* petitioner twice refused to waive his rights within a one-hour period of time. Thereafter he was confronted with a co-defendant who told petitioner he had confessed and asked him to show the police where the weapon was hidden, which he did. The Federal court of appeals held that the weapon was improperly admitted into evidence in violation of *Miranda,* finding that the police had continually implored petitioner to talk and then confronted him with a co-defendant in order to gain incriminating testimony even though petitioner had expressed his desire to remain silent. The court concluded that absent an affirmative indication of the accused's desire to waive his right against self-incrimination this procedure would not be countenanced. In *Crisp* the

defendant was subjected to immediate persistent interrogation even after he had indicated he did not wish to answer any questions pertaining to the crime of which he was charged. It is of interest that in *Crisp* defendant's statement, given several months after the improper questioning, was held admissible because defendant was fully informed of his rights.

In the present case over 24 hours had elapsed between the time that Williams informed police he did not wish to speak and his agreement to give a statement. During this interval there is no evidence of any persistent police exhortations as condemned in *Doss* and *Crisp*. Rather the testimony indicates that Williams acquiesced without being subjected to compulsion or intimidation after being fully informed of his rights. We find the trial court did not err in concluding that these statements were voluntarily made. See *United States v. Collins (2d Cir. 1972), 462 F.2d 792, 797, cert. denied, 409 U.S. 988; People v. Gary (1972), 31 N.Y.2d 68, 286 N.E.2d 263.*

Nor do we find that the failure to take Williams before a judge in Will County prior to his return to East St. Louis detracts from our above conclusion as to the voluntary nature of his statements. The applicable statute provides in part that "Any person arrested in a county other than the one in which a warrant for his arrest was issued shall be taken without unnecessary delay before the nearest and most accessible judge in the county where the arrest was made." (Ill. Rev. Stat. 1969, ch. 38, par. 109–2.) The Committee Comments to this section state, "It is designed to provide a preliminary hearing on probable cause in the county where the arrest is made, thus avoiding the inconvenience of taking the accused away from his home county merely for a preliminary hearing and setting of bail." (S.H.A. Committee Comments, ch. 38, par. 109–2, p. 292.) From the facts presented it may be argued that this section is not applicable to Williams, but, in any regard, a delay which might have been occasioned in

presenting Williams before a judge is merely another factor in the determination of the voluntary nature of his statements. *People v. Brooks, 51 Ill.2d 156, 165.*

Defendants also argue that the jury members were more prone to render a guilty verdict because they were selected, in part, based upon their ability to recommend the death penalty. In support of this position they submit a survey compiled by Professor Hans Zeisel. Moreover, they claim that in *Furman v. Georgia, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726,* it was recognized that the death penalty is a cruel and unusual punishment. They conclude that the trier of fact capable of recommending such sentence is thus more likely to convict. We find no merit to this contention. In *People v. Clark, 52 Ill.2d 374, 392-93,* we rejected Professor Zeisel's survey as convincing proof of defendants' position. (*Cf. People v. Brooks, 51 Ill.2d 156, 167-68.*) Nor is *Furman* determinative in resolution of this issue for in a companion case (*Moore v. Illinois, 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562*) the United States Supreme Court specifically held that although the death penalty might not be imposed the conviction would not be overturned.

It is urged that defendants' guilt was not established beyond a reasonable doubt. They argue that Dansberry's testimony was basically unreliable for he was not at the actual scene of the offense and could not testify as to what happened. Also they say his accomplice testimony must be viewed with grave suspicion for he had pleaded guilty and was awaiting sentencing. They further maintain that the contents of their statements were supplied by the police and not by them.

The testimony of an accomplice alone, if credible, is sufficient to sustain guilt. (*People v. Farnsley, 53 Ill.2d 537, 544-45.*) Here, portions of Dansberry's testimony are supported in part by other witnesses. Their testimony corroborates the time of the occurrence, the type of weapon which could have been used, the fact a car such as

Pittman's was in the area, the attempt to obscure the license plates of Pittman's vehicle, the amount of money and type of wedding ring taken, and the number of people leaving the truck. We find that this evidence produces a high degree of credibility for Dansberry's other testimony which establishes defendants' participation in the crime.

There is no convincing basis in the record for their argument that the version of the killing contained in the statements is attributable to the police. The defendants' confessions were in narrative form, but it was determined that their entire substance was derived from defendants' admissions. The statements were typed by a police officer, and while they do not exhibit the highest degree of typing skill, each is phrased in language which is readily understandable. We find from the testimony presented and the statements properly admitted into evidence that defendants' guilt was overwhelmingly established.

Defendants maintain that various errors occurred during the course of the proceedings which require reversal of their convictions. First, they say their motion for severance should have been granted because the jury was incapable of rendering a separate verdict based on the evidence as to each defendant and would tend to consider their statements against all the defendants without allowing them the opportunity to cross-examine the declarant. (*Bruton v. United States, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.*) While a severance might have been improvidently denied, we find that such disposition of defendants' motion was error which was harmless beyond a reasonable doubt. *Schneble v. Florida, 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056; People v. Burbank, 53 Ill.2d 261, 267-69.*

Defendants challenge the trial court's denial of their motion for a joint conference between themselves and their attorneys made less than two weeks prior to trial. They conclude they were forced to trial without being afforded the opportunity to form a unified defense. This

motion was filed on behalf of Pittman, Williams and Dansberry. Their attorneys did not request a continuance after denial of this motion in order to prepare their defenses, and except for this bare allegation there is no attempt to specifically demonstrate the possible defense which might have been employed had such conference been permitted. We do not find that the trial court's ruling is tantamount to reversible error in this instance.

Defendants contest the trial court's decision to permit Dansberry to be treated as a hostile witness. (50 Ill.2d R. 238.) The propriety of utilizing such procedure rests largely within the discretion of the trial court. (*People v. Gallery, 336 Ill. 580, 585.*) Dansberry, without argument, was an occurrence witness to many of the relevant matters involved in this crime. His initial testimony was evasive and, as described by Pittman's counsel in closing argument, given in a "very hesitant" manner. We conclude that the trial court did not abuse its discretion in authorizing this procedure.

Defendants argue that the introduction of inflammatory evidence prejudiced the jury. They contend the testimony of the victim's widow as to the number of children in their family, her description of the gold wedding band, the amount of money her husband carried and her identification of his blood-stained clothing was improper. Further they claim the detailed testimony of Dr. Kane concerning the victim's wounds was of a similar nature.

While we have held that questions pertaining to a victim's surviving family are improper (*People v. Bernette, 30 Ill.2d 359*), where, as here, there is no doubt as to the sufficiency of the evidence of defendants' guilt such error will not require reversal of their convictions (*People v. Gill, 54 Ill.2d 357, 368-69; People v. Wilson, 51 Ill.2d 302, 307-08*). The widow's testimony concerning the description of the wedding band and the amount of money her husband customarily carried was highly relevant for it

tended to substantiate Dansberry's testimony. Similarly the introduction of the victim's clothing and testimony of Dr. Kane was not impermissible in this instance, for that evidence was relevant in establishing the manner in which the victim was killed. See *People v. Newbury, 53 Ill.2d 228, 242.*

Error is asserted in the failure to exclude the in-court identification of Pittman by Louise Jennings. Defendants premise this argument on the basis of the State's action during defense cross-examination of this witness when it requested a side bar conference leaving Pittman as the only white man seated at the defense table, thereby creating an unduly suggestive atmosphere for his subsequent identification. Defendants concede that an earlier conference of this nature transpired at their instigation but seek to diminish the impact of this earlier one by saying that the identification came only after the later conference. We find this contention to be without merit. The conference requested by the State took place some time before her identification of Pittman and was further removed in time by an intervening recess. There is no indication that the State's request was designed to isolate Pittman and suggest to this witness that he was the white youth whom she saw. From these facts defendants cannot complain of this witness's response to the defense inquiry. *Cf. People v. George, 49 Ill. 2d 372, 379; People v. Burage, 23 Ill.2d 280, 282-83, cert. denied, 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651.*

They further maintain that it was error to introduce the knife given to the East St. Louis police in Will County when Williams was placed in their custody, for there is no evidence linking this item to the crime. We find no error in its admission. In Williams's statement he said it was his knife and Mobley's statement indicates that he used it during the commission of the crime.

Defendants further complain they were prejudiced when the trial court informed the jury in opening

argument and during the trial that defendants' statements had been previously held to be admissible. It is their contention such remarks unduly enhanced the credibility of these statements. The first remark was occasioned by defense counsel's opening statement to the jury that it would find these confessions were not voluntary. The second occurrence, as heretofore described, was prompted by defense counsel's reference to the suppression hearing during cross-examination of a police officer. "The practice in this State is to submit to the jury only the question of the credibility of an accused's confession and to reserve for the court the determination of the question of the voluntariness of the confession." (*People v. Nicholls, 42 Ill.2d 91, 102, cert. denied, 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578; Lego v. Twomey, 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619.*) Both remarks correctly reflected the law applicable to this case. Moreover, the trial court instructed the jury that any remark it had made during the course of the trial should not be considered as reflecting upon the facts or what the verdict should be. Any prejudice which might have arisen was therefore sufficiently alleviated.

Finally, defendants assert that the State's closing argument was improper. The portion to which they primarily object deals with the State's urging that each be sentenced to death. Prior to this, however, it requested that the jury establish each defendant's guilt before discussing the appropriate penalty. Since the sentence of death is no longer possible, we need not now consider this contention. (*People v. Powell, 53 Ill.2d 465, 476.*) We have examined the remaining argument and find that even if error had been committed, the jury's verdict would not have been otherwise. *People v. Koshiol, 45 Ill.2d 573, 580, cert. denied, 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209.*

The sentences of death may not stand. (*Moore v. Illinois, 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562.*)

However, there exists no error requiring reversal of the convictions. The judgments of the circuit court of St. Clair County are affirmed, but the sentences are vacated and the cause remanded to that court with directions to sentence defendants to a penalty other than death.

*Affirmed and remanded.*