(No. 46610.–
(No. 46649.–

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MELVIN BAILEY, Appellee.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ANDREW McCHRISTIAN, Appellee.

*Opinion filed January 30, 1975.*

38

RYAN, J., and UNDERWOOD, C. J., dissenting.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel, Assistant Attorney General, and Patrick T. Driscoll, Jr., and James S. Veldman, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

Kenneth L. Gillis and Jack P. Rimland, of Chicago, for appellee Melvin Bailey.

James D. Montgomery, of Chicago (David Lowell Slader, of counsel), for appellee Andrew D. McChristian.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

In cause No. 46610 defendant Melvin Bailey, following a jury trial in the circuit court of Cook County, was convicted on five counts of attempted murder and one count of conspiracy to commit murder. He was sentenced to concurrent terms of 10 to 15 years in the penitentiary. The appellate court reversed and remanded the cause for a new trial, holding that prejudicial hearsay testimony had been introduced by the State, thereby depriving Bailey of a fair trial. *People v. Bailey*, 18 Ill. App. 3d 80.

In cause No. 46649 co-defendant Andrew McChristian was similarly charged and jointly tried with Bailey and Edward Dinkins. The latter was acquitted by the trial

court at the close of the State's case in chief. The jury found McChristian guilty solely of the conspiracy charge. He was sentenced to the penitentiary for a term of 7 to 14 years. The appellate court, one justice dissenting, reversed, holding that the evidence presented did not sufficiently establish a conspiracy to commit murder as averred in the indictment. *People v. McChristian*, 18 Ill. App. 3d 87.

We granted the State's petition for leave to appeal in both causes and have consolidated the matters.

About 9:30 p.m. on May 8, 1968, three police officers assigned to the Gang Intelligence Unit stopped a car on the south side of Chicago driven by David Barksdale and containing four other persons. Barksdale was known to officers Foulkes, Clark and Peck as the leader of a street gang named the Disciples. The officers searched Barksdale and the others for weapons but found none. A search of the passenger compartment of the car also failed to disclose any weapons. Barksdale and his passengers drove away with the officers closely following in an unmarked police car.

After driving about the area for several minutes Barksdale arrived at 6526 S. Ellis, where he stopped the car and raced its motor. Shouts were heard and then gunfire erupted. The police, who had stopped several car lengths behind Barksdale's car, exited their vehicle and arrested Bailey and McChristian, both of whom were members of a rival street gang called the Blackstone Rangers. The police recovered .45-caliber and .25-caliber automatic pistols and a .22-caliber "sawed-off" carbine. Dinkins was arrested as he apparently attempted to intercede on behalf of the other defendants. Meanwhile, Barksdale drove a short distance from the area and waited for the police to arrive. All then went to the police station.

In summary, officers Foulkes and Clark testified that as they stopped behind Barksdale's car at the Ellis Avenue location someone shouted "D's" and then "Blackstones," whereupon numerous individuals began to shoot from

both sides of the street. As Barksdale drove off, Bailey ran from the curb into the street and fired several shots toward the car. Foulkes and Clark fired several shots at Bailey, who momentarily ducked behind a parked car. Clark saw Bailey throw an object under the vehicle and then flee down a gangway where he was apprehended. Clark recovered a "warm" .45-caliber pistol from under the car. This weapon was empty with the slide ejector in a rearward position. During this time Officer Peck, who also recognized Bailey, saw two others firing from the curb at Barksdale's car, and he chased one of them to a nearby porch where he arrested McChristian as the latter was attempting to unjam a loaded .25-caliber pistol. Clark and Peck were of the opinion that the shooting did not last more then 30 seconds. Evidence further indicated that Bailey and McChristian were members of the Main 21, the ruling hierarchy of the Blackstone Rangers, which at this time was involved in altercations with the Disciples.

When the defendants were transported to the police station, they saw Barksdale. Peck testified that at this juncture Bailey remarked to Barksdale, "We didn't get you this time." McChristian, who was chuckling, responded, "We will get him next time."

David Barksdale was called by the State, but after he refused to testify he was granted immunity and made a court's witness. He corroborated much of the testimony concerning the officers' initial stop and search of his vehicle. Barksdale knew the police were following and that he was "playing" with them as he drove into "Ranger territory." He stopped the car for several seconds at the Ellis Avenue location, and during this brief time he heard someone shout "D's" and then several shots were fired from both sides of the street, which caused him to drive quickly from the area. He claimed that one bullet struck the back of his car. Barksdale denied seeing Bailey at the time of the shooting and, although he admitted he saw McChristian sitting on a porch, he did not see the latter

with a gun, nor did he see anyone firing at his car. When Barksdale arrived at the police station after the shooting, he saw the defendants and Dinkins, but he claimed they did not say anything to him although McChristian laughed.

Thereupon the State elicited from Barksdale the fact that on prior occasions, commencing about the time of the shooting and culminating on the day he testified, he made various statements to law-enforcement officials concerning the involvement of Bailey and McChristian in the shooting. He was less certain as to Dinkins' participation. One of these conversations occurred with an assistant State's Attorney, Matthew Walsh. Barksdale explained that at the times he implicated the rival gang members he lied because he was mad that he had been shot at.

At this juncture the trial court instructed the jury as follows:

> "*** It is proper to impeach or discredit a witness by proving statements made by such witnesses at some other time and place, different from the testimony in this case on trial, still any statement that any witness may have made at such other time and place is not to be considered by you as any evidence as to the guilt or innocence of the defendant or any of them. Evidence that on some former occasion a witness made a statement different from or inconsistent with his testimony in this case should only be considered by you in deciding the weight to be given to that witness."

Matthew Walsh was thereafter permitted to testify, over defense objections, as to a conversation he previously had with Barksdale. During their discussion, certain facts of the case were mentioned by Barksdale, who told Walsh of Bailey's remark to him which was made in the police station after the shooting and McChristian's response thereto. Barksdale also purportedly told Walsh that he was telling the truth, although he just shrugged his shoulders

when Walsh asked him if he would testify in this manner at trial.

Andrew McChristian testified in his own behalf. He claimed that on the evening of the shooting he and Bailey were with several girls sitting on a porch when someone shouted "here comes David" and many people started to run. McChristian said that he attempted to flee into a crowded hallway but he and Bailey were unable to gain entrance. Bailey ran in another direction and McChristian lay down on a nearby porch until the gunfire ceased and Peck arrested him. McChristian claimed that he was unarmed and that Peck found the .25-caliber pistol near the curb. He further denied having any conversation with Bailey or Barksdale at the police station, and he specifically disclaimed stating that they would "get" Barksdale at some other time.

During closing arguments the State, over repeated defense objections, emphasized and detailed the prior out-of-court statements that Barksdale had made. The State further requested the jury to consider whether Walsh or Barksdale was telling the truth. The trial court instructed the jury, as it had previously, concerning the use of prior inconsistent statements of a witness.

We agree with the appellate court that the State's tactics pertaining to the use of Barksdale's prior inconsistent statements were improper. In *People v. McKee,* 39 Ill.2d 265, 270 we stated:

> "In considering the admissibility of this testimony it is necessary to understand the difference between the right to impeach a witness and to cross-examine him as a court's witness. A witness may be made a court's witness and subjected to cross-examination by either side where, for sufficient reason shown, his integrity or veracity is doubtful and neither side desires to vouch for his testimony. The purpose of the rule is to prevent a miscarriage of justice by having an

eyewitness to the crime fail to testify, but the cross-examination should be strictly restricted to the direct issues and not permitted on collateral matters. [Citations.] In effect, it is an attempt to arrive at the truth based on sworn testimony. The purpose of impeachment is to destroy credibility, not to prove the facts stated in the impeaching statement. What the witness stated out of court and out of presence of the defendant is pure hearsay and incompetent. Legally it is not evidence of defendant's guilt and cannot be received as proof of the fact at issue. [Citations.] As stated in *People v. Grigsby,* 357 Ill. 141, 149, 'If the witness admitted making the previous statement, it would prove nothing except that he, an admittedly unreliable witness, had said so. If the witness denied making the statement the matter would necessarily end there, because to pursue it further would be trying a collateral issue rather than a fact material under the indictment. The defendant would thus be hopelessly enmeshed in a prejudicial situation without anyone having assumed responsibility or liability for perjury.' "

It has been further recognized that jurors may find difficulty in consideration of prior inconsistent statements used solely to determine credibility and they might afford such testimony substantive value. *People v. Paradise,* 30 Ill.2d 381, 384.

Here, Barksdale's own admission of prior statements inconsistent with his trial testimony seriously detracted from his credibility. The State, however, endeavored to prove the substance of this witness's prior statements by the testimony of Matthew Walsh. Examination of the record establishes a thinly disguised effort by the State to impart substantive character to Barksdale's prior inconsistent statements, although such attempts have been repeatedly rejected by this court (*People v. Collins,* 49 Ill.2d

179, 198; see also *People v. Gant,* 58 Ill.2d 178, 185; *People v. Powell,* 53 Ill.2d 465, 472). Despite the trial court's cautionary instructions, we conclude that error occurred in this regard (see *People v. Montgomery,* 51 Ill.2d 198, 207), and we cannot say that this error was harmless beyond a reasonable doubt. The judgment of the appellate court in cause No. 46610, insofar as it required that Bailey be granted a new trial on the attempted-murder charges is affirmed. For the reasons hereinafter expressed, his conviction of conspiracy to commit murder is reversed.

In regard to defendant McChristian's case (No. 46649), the appellate court majority noted that the conspiracy indictment specifically provided that McChristian and others agreed to murder Barksdale and the four named occupants of his car and in furtherance thereof fired weapons at the vehicle. (Ill. Rev. Stat. 1967, ch. 38, par. 8—2(a).) The appellate court reasoned that the State had to prove not only that the accuseds knew Barksdale was in the car but also that they shot at the car with intent to murder. With regard to this latter requirement, the appellate court deemed it significant that, while police testimony indicated many persons were firing numerous shots, not one bullet was positively demonstrated to have hit Barksdale's vehicle. While the evidence showed that a shooting occurred, the appellate court held that the criminal conduct of McChristian was not such as to sustain the conspiracy conviction.

Section 8—2(a) of the Criminal Code provides, in pertinent part:

> "A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator." Ill. Rev. Stat. 1967, ch. 38, par. 8—2(a).

The Committee Comments to this section state,

"Since an agreement (by words, acts or understanding) is required, there must be (1) an intent to agree. And, the *agreement* must be accomplished with (2) an intent that the offense which is the object of the agreement be committed." (Emphasis in original.) (S.H.A., ch. 38, par. 8–2, at 459 (1972).) Circumstantial evidence may be used to demonstrate the requisite intent (*People v. Perry*, 23 Ill.2d 147, 154) and the existence of conspiracy may be inferred from conduct, statements and other circumstances that disclose a common criminal purpose (*People v. Link*, 365 Ill. 266, 282).

The State argues that the concerted efforts of Bailey and McChristian at the time of the shooting as well as their conversation in the police station after their arrests is sufficient to permit a jury to conclude that a conspiracy existed. We do not agree.

The evidence does not establish beyond a reasonable doubt that Bailey, McChristian and others had agreed to murder Barksdale or any one else. Rather it clearly appears that Barksdale drove to the Ellis Avenue location in a car known to defendants and others, stopped and then raced the motor. The obvious purpose was to incite a rival and hostile street gang knowing that the police were a short distance behind in an unmarked squad car. Almost simultaneously with Barksdale's unexpected appearance and his recognition, gunfire erupted from both sides of the street.

While it might be argued that the defendants were members of a rival street gang, this mere relationship does not establish an intent to agree to kill Barksdale. (*People v. Gates*, 29 Ill.2d 586, 591.) Moreover, while the statements of Bailey and McChristian at the police station after the shooting might be construed as admitting to a conspiracy to shoot Barksdale, under the circumstances of this case, particularly the almost instantaneous or "knee jerk" reaction attributed to the defendants as well as other possible gang members, the evidence is sufficiently improb-

able and raises a reasonable doubt of a conspiracy to murder.

Accordingly, the judgment of the appellate court insofar as it reversed and remanded Bailey's conviction of attempted murder is affirmed. Since the same evidence was presented to establish both McChristian's and Bailey's guilt of conspiracy, and we have held that evidence insufficient as to McChristian, then Bailey's conviction of this offense is reversed. The judgment of the appellate court reversing McChristian's conviction is affirmed.

*46610 — Affirmed in part and reversed in part.*

*46649 — Judgment affirmed.*

MR. JUSTICE RYAN, dissenting:

I cannot agree with the conclusion reached by the majority of this court with respect to defendant Bailey, nor can I agree with the conclusion of the majority with respect to defendant McChristian.

In the case of Bailey, the majority reverses the conviction of the defendant on the attempted-murder charge because of the introduction of hearsay evidence. Since the majority concludes that it cannot say that "this error was harmless beyond a reasonable doubt," it finds that the conviction has to be reversed and the defendant granted a new trial.

I would first observe that this question does not involve error of constitutional magnitude. It involves only an alleged error in the admission of evidence, and no constitutional issue is involved unless we are to consider every trial error as raising a constitutional question. Therefore, we are not concerned with the "harmless error beyond a reasonable doubt" test of *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824. We are instead concerned with whether the competent evi-

dence is sufficient to prove the defendant's guilt beyond a reasonable doubt. Assuming but not conceding that it was error to introduce proof of Barksdale's prior statement, I find sufficient other competent evidence to establish Bailey's guilt of attempted murder beyond a reasonable doubt.

The majority states that Officers Foulkes and Clark testified that they saw Bailey run into the street and fire several shots at the car driven by Barksdale; that Bailey threw an object under a parked car which Officer Clark recovered and that the object was a "warm" .45-caliber pistol. Officer Peck testified that at the police station Bailey remarked to Barksdale, "We didn't get you this time," and that McChristian replied, "We will get him next time." Barksdale, himself, testified that as his car was stopped on the street near where Bailey was apprehended, he heard some shouts and then heard several shots fired, one of which struck his car. In light of the strength of this evidence of guilt, it is difficult to see how the elimination of Barksdale's out-of-court statement would have altered the verdict, it is only where the trial error results in manifest prejudice to the defendant that a court of review will interfere. (*People v. Pittman,* 55 Ill.2d 39, 59; *People v. Wilson,* 51 Ill.2d 302, 307-8; *People v. Burris,* 49 Ill.2d 98, 104.) In view of the strength of this evidence, I can see no need for reversing Bailey's conviction of attempted murder and remanding his case for a new trial.

The defendants, Bailey and McChristian, were convicted by the jury of conspiracy to commit murder. The majority of this court reverses that conviction because "the evidence does not establish beyond a reasonable doubt that Bailey, McChristian and others had agreed to murder Barksdale or anyone else." Of course, it is not necessary, and in most cases not possible, to prove an agreement between co-conspirators by direct evidence. It is only necessary to show that they pursued a course tending toward the accomplishment of the objective of which

complaint is made. (*People v. Perry*, 23 Ill.2d 147, 155; *People v. Walczak*, 315 Ill. 49.) Whether a scheme is a conspiracy or separate ventures is ordinarily a question of fact and may be proved not only by direct evidence but by inferences from conduct, statements, facts and circumstances which disclose a common design on the part of the accused and others to act in pursuance of a common criminal purpose. (*People v. Brinn*, 32 Ill.2d 232.) Examining the evidence of conspiracy in the light of these principles, we find that McChristian and Bailey knew each other; they were members of the same street gang; David Barksdale was a member of a rival street gang; McChristian and Bailey were sitting on a porch with some girls when someone shouted, "Here comes David"; the defendants knew David Barksdale and his automobile; the defendants were both seen by the officers firing shots at Barksdale's automobile as it left the scene and Officer Peck testified that at the police station, as noted above, Bailey said to Barksdale, "We didn't get you this time," and McChristian, who was chuckling, responded, "We will get him next time." In my opinion, these facts, particularly the statements of Bailey and McChristian made at the police station, clearly establish that a common design existed to murder Barksdale. In fact McChristian's reply, "We will get him next time," is strong evidence that the common design to murder him had not terminated.

The majority opinion somehow concludes that this evidence does not establish that Bailey and McChristian had agreed to murder Barksdale or anyone else and characterizes the conduct of the defendants as instantaneous or "knee-jerk" reaction. However one may characterize it, the fact remains that Bailey had fired several shots from a .45-caliber pistol and that McChristian had fired at least one shot from a .25-caliber pistol. These were not toys, and had one of the bullets found its mark, both of these defendants would have been prosecuted for murder. In my opinion, there is adequate evidence to find

both Bailey and McChristian guilty beyond a reasonable doubt of conspiring to commit murder. I can see no reason for setting aside the verdict of the jury.

MR. CHIEF JUSTICE UNDERWOOD, with whom MR. JUSTICE RYAN joins, dissenting:

To the extent that the majority opinion may be thought to hold the prior inconsistent statements incompetent, I do not agree. That those statements were emphasized beyond proper limits, I concede. But I concur with Mr. Justice Ryan that, considering the evidence in this case, reversal of the convictions is unnecessary.

In my judgment, earlier decisions of this court are not in harmony and have resulted in the impression that prior inconsistent statements by witnesses made outside the presence of defendants, and relating directly to the guilt or innocence of those defendants, are inadmissible for the purpose of impeaching the credibility of such witnesses. A careful analysis of those cases, however, reveals that this court has not intended to establish such a broad rule, but rather has attempted to eliminate attempts by the State to use such hearsay statements as substantive evidence under the "guise of impeachment." Despite the unfortunate use of overly broad language in several cases, this court has permitted and should, in my view, continue to permit the use of such statements when the record clearly reveals that their sole purpose was impeachment and no attempt was made by the State to impart substantive value to them. While I agree that the unnecessary emphasis upon the impeaching evidence in this case merits criticism, the court does not address itself to the problem created by our past decisions. I therefore feel compelled to add my own comments which I hope may serve to clarify what I regard to be substantial confusion regarding the proper use of prior inconsistent statements to impeach witnesses in criminal cases.

In *People v. Johnson* (1929), 333 Ill. 469, the trial court had granted the State's request to have Florence Ford called as a court's witness. She had previously stated out of court to four people that the defendant had sold her a radio taken in the burglary for which he was on trial. She subsequently changed her story, exonerating the defendant, and told this second story on the witness stand, as the State knew she planned to do when it asked she be made a court's witness. When confronted with her previous statements, she denied them, whereupon the State was allowed to call the four witnesses to the previous statement in order to impeach her testimony. This court, stating that her testimony was entirely immaterial, reversed the defendant's conviction:

"The only object of having her called as a witness was not to get the testimony which she was expected to give, but to get before the jury her unsworn statement which it was intended to offer *under the guise of impeachment*." (Emphasis added.) 333 Ill. 469, 475.

In *People v. Barragan* (1929), 337 Ill. 531, defendant had been indicted for robbery with two other men, Drury and Brodie. Drury, who had pleaded guilty, was returned from the penitentiary as a court's witness and testified that the defendant did not commit the robbery with him. He was then confronted with a prior statement he had made to police implicating the defendant, but he denied making the statement. The police officer who transcribed the statement then testified that Drury had in fact made the statement. Although much closer than *Johnson* to being proper impeachment, this court again reversed the conviction, concluding from the record that the "whole purpose of the offer was to get before the jury evidence of Drury's unsworn statement that Barragan participated in the crime." 337 Ill. 531, 536.

In *People v. Grigsby* (1934), 357 Ill. 141, defendant had been tried and convicted of assault with intent to

murder. Mary Lockard had told the State's Attorney prior to the trial that the defendant had come to her home the night of the crime and told her that he "had just shot a couple of guys." Once on the witness stand, it was obvious that she was changing her story, and the State was allowed to withdraw her as a witness. She was later recalled as a court's witness and questioned about her previous statement without any foundation being laid for impeachment. The State's Attorney merely asked her whether she had been asked certain questions and given certain answers, to which she replied, "Yes, sir." This court reversed the conviction, condemning such advance impeachment as an obvious attempt to use Mary Lockard's statement for substantive purposes:

"All of these matters sought to be introduced by the indirect method of advance impeachment of a witness who had not testified to the contrary are collateral to the main issue. *Whether or not in a proper case they might be competent by way of impeachment, they were entirely incompetent and extremely prejudicial as here offered on the case in chief.*" (Emphasis added.)(357 Ill. 141, 148-49.)

In reversing the convictions in *Johnson, Barragan,* and *Grigsby,* this court was responding to the use of improper tactics by the State under the "guise of impeachment," but, it seems to me, clearly did not intend to establish a rule forbidding *proper* impeachment by the use of prior inconsistent statements.

In *People v. Hundley* (1954), 4 Ill.2d 244, defendant's girlfriend was made a court's witness after it was clear that her testimony would not be in agreement with her previous statements to police. She was then impeached with the statement which was damaging to the defendant. Relying on *Johnson, Barragan,* and *Grigsby,* this court reversed the conviction, noting once again that the real intention of the State was not proper impeachment.

It was in *People v. Tunstall* (1959), 17 Ill.2d 160, that this court first enunciated a rule seeming to forbid the use of certain prior statements even for proper impeachment. Defendant, on trial for armed robbery, had called as a witness James Webb, who was also charged with the crime. Webb testified that he had indeed committed the crime but completely exonerated the defendant. When confronted by the State with a previous statement implicating defendant, Webb admitted making the statement but claimed it was untrue. The prosecutor then interrogated Webb concerning each question and answer in the previous statement, introduced police testimony that the statement was given voluntarily by Webb, and read the entire statement into evidence. The jury was never instructed that the statement was admissible only for purposes of impeachment and "its introduction into evidence left the jury free to look upon it as further evidence of the defendant's guilt." (17 Ill.2d 160, 166.) Despite the improper use of the statement as substantive evidence, clearly impermissible under prior decisions, the court then cited *Hundley* and *Barragan* as authority for a rule that "the admission of a confession or statement made outside the presence of a defendant is not competent, *even for the purpose of impeachment,* where such statement or confession bears directly upon a defendant's guilt or innocence of the crime, and is likely to have a prejudicial influence on the minds of the jury." (Emphasis added.)(17 Ill.2d 160, 166.) But even after thus announcing what appears to be a broad rule forbidding the use of such prior statements for any purpose, the court, commenting on *Barragan,* indicated that its real concern, as in every previous case, was the use of such statements for substantive purposes:

"It is apparent from the language of the *Barragan* case that it is futile to contend that Webb's contradictory testimony served to make his statement competent against defendant, or that its admission into evidence was harmless

error. The statement was made outside defend-
ant's presence, was not assented to by him and, in
view of his own testimony of denial and alibi,
could only have resulted in prejudicial influence
in the minds of the jurors, particularly since its
use and purpose in evidence was in no manner
limited. Moreover, from the prosecutor's action in
bringing each and every detail of Webb's state-
ment to the attention of the jury, suspicion
attaches that he was not motivated by a purpose
of impeachment alone, but also by a desire to get
before the jury Webb's statement that defendant
had prepared for the crime, assisted in its commis-
sion, and shared in its spoils." 17 Ill.2d 160,
167-68.

In *People v. Tate* (1964), 30 Ill.2d 400, this court held
that the rule announced in *Tunstall* was too broad and that
*proper* impeachment was not forbidden. Defendants, on
trial for murder, called as a witness Hosie Laws, who had
been indicted with them and had pleaded guilty to the
crime. He testified that he alone was responsible for the
murder, but was impeached with a previous statement he
had given police implicating defendants. After the prosecu-
tor read the questions and answers once, the parties
stipulated that the court reporter who took the statement
would verify it, and the questions and answers were then
read again to the jury by the prosecutor. The judge
overruled defendants' objection to admission of the
statement, stating "it is a matter of attempted impeach-
ment." The jury was given no other explanation or
instruction with regard to this prior statement. After
quoting the broad rule announced in *Tunstall*, the court
noted that the "factual situations in the three cases cited
[in *Tunstall*] for the broad proposition thus announced
[there] differed from the problem present in the *Tunstall*
case" (30 Ill.2d 400, 403), and added that the decision in
*Tunstall* "did not rest solely upon the broad statement

[announced there] and *that statement is not adhered to."* (Emphasis added.)(30 Ill.2d 400, 404.) The conviction of the defendants was reversed because "as in *Tunstall,* the jury was not adequately instructed as to the limited purpose for which the impeaching evidence could be used." (30 Ill.2d 400, 405.) Thus, in plain terms, this court disavowed and limited the scope of the broad language of *Tunstall.*

However, the court then seemed to ignore *Tate* in deciding *People v. McKee* (1968), 39 Ill.2d 265, which is quoted with apparent approval by the majority in this case. The defendant was being tried for murder in a bench trial. The State called Edward Clifford, an alleged accomplice, as a witness, but he stated that he and McKee were innocent, whereupon he was made a court's witness. On the theory of impeachment, he was confronted on a question-and-answer basis with every item in two prior statements he had given police implicating himself and the defendant. Clifford recalled making the statements but declared repeatedly that they were false. One of the statements was quite lengthy, and Clifford was on the stand almost a full day. The trial court, although admitting the statements for purposes of impeachment, had in its findings given substantive effect to certain information contained only in those prior statements. McKee's conviction was reversed since the statements were thus obviously "admitted as evidence under the guise of impeachment and had no probative value as to the guilt of the defendant." (39 Ill.2d 265, 272.) With no mention of *Tate,* the court then reaffirmed and even broadened the discredited *Tunstall* rule by adding the following dictum: "Had the case been tried before a jury the admission of such testimony would necessarily constitute reversible error for the reason that such evidence is not competent even for the purpose of impeachment where the statement bears directly upon defendant's guilt or innocence." (39 Ill.2d 265, 271.) The court even failed to add the final sentence

of the *Tunstall* language—"and is likely to have prejudicial influence on the minds of the jury" (17 Ill.2d 160, 166)—noting only that the "prejudicial affect [*sic*] upon a jury would be too much." 39 Ill.2d 265, 271.

Faced with the same issue once again in *People v. Marino* (1970), 44 Ill.2d 562, this court plainly demonstrated that it was not bound by the dicta in *Tunstall* and *McKee*. Defendants were charged with theft of property exceeding the value of $150. One of the police officers who had apprehended them was called as a court's witness after his attorney advised the State that his testimony would differ from his prior statements. His previous testimony at the preliminary hearing and before the grand jury was damaging to the defendants because his identification of them as the persons who ran from the scene of the crime was positive and he had revealed that they had offered him a bribe after being apprehended. At the trial, however, he could not positively identify defendants, who were apprehended after a short chase, as the men he saw run from the scene, nor could he recall a conversation with them after taking them into custody. When the State used the officer's previous statements for impeachment, the trial judge specifically instructed the jury that such statements were for impeachment only. The officer stated that he couldn't remember making the prior statements, whereupon the parties agreed that the court transcripts of the previous testimony were correct. The jury was again advised of the limited use of these prior statements. This court held that the statements were properly used for impeachment and distinguished *McKee:*

> "Unlike the situation in the present case, the statements used [in *McKee*] under the guise of impeachment were in part admissions of guilt made by the witness out of the presence of the defendant implicating the latter in the crime. [Citation.] Further, the trial court had there allowed the State to vigorously and minutely

cross-examine the witness on matters purely collateral to the issues in the case. Here the trial court specifically admonished the jury during the State's cross-examination of Sgt. Prokop that prior inconsistent statements made by such witness were to be used only for the purpose of determining his credibility and not as proof of the assertions therein made. In addition, the impeaching statements were largely germane to the issues in the case. Defendants do not question the propriety of the trial court's decision in making Sgt. Prokop its own witness; the State needed his testimony in order to establish defendant Pettit's participation in the crime, and under the circumstances present at the trial, we do not believe that the State's cross-examination of Prokop constitutes reversible error." (44 Ill.2d 562; 577-78.)

Although perhaps not as damaging as some of the prior statements in other cases, the officer's previous statement was certainly one bearing directly on defendants' guilt or innocence since it affirmed that the persons apprehended were in fact the same persons who ran from the scene of the crime. And at least the statement before the grand jury was given outside the presence of the defendants. This decision, in my judgment, is a square holding that any prior inconsistent statement is admissible for impeachment when the court insures that such is its sole purpose.

I believe that the court's true position on this issue was stated fully and accurately in *People v. Paradise* (1964), 30 Ill.2d 381, 383-85:

"This court has consistently held that evidence of prior inconsistent statements by a witness is admissible to impeach his credibility. (*People v. Morgan,* 28 Ill.2d 55; *People v. Moses,* 11 Ill.2d 84; *People v. Biloche,* 414 Ill. 504; *People v. Smith,* 391 Ill. 172; *People v. Gleitsmann,* 361 Ill. 165; *People v. Romano,* 337 Ill.

300; *People v. Graves,* 331 Ill. 268; *People v. Popovich,* 295 Ill. 491.) The admission of such evidence is premised on the fact that its exclusion would deprive the party seeking to use it of his opportunity to exhibit the truth and in leaving him the prey of a hostile witness. (3 Wigmore on Evidence, 3rd ed. sec. 903.) It must be recognized, however, that in criminal cases these extrajudicial statements are often highly incriminating and are usually made outside the presence of the defendant. To give these statements substantive value would allow an accused to be convicted on extrajudicial statements of witnesses—a practice that runs counter to the notions of fairness on which our legal system is founded. (*Bridges v. Wixon,* 326 U.S. 135, 89 L. Ed. 2103, 65 S. Ct. 1443.) Therefore, prior self contradictions are not to be treated as having any substantive or independent testimonial value. *People v. Morgan,* 28 Ill.2d 55; *People v. Moses,* 11 Ill.2d 84; see also 3 Wigmore on Evidence, 3rd ed. sec. 1018; McCormick on Evidence, sec. 39.

While we have recognized the necessity for, and permitted the use of, contradictory statements for impeachment, we have also recognized the danger that the out-of-court statement may be taken by the jury as substantive testimony in place of the statement on the stand. As a practical matter, it may be impossible for a juror to consider extrajudicial statements as bearing on the credibility of the witness and avoid being influenced by it as substantive evidence on the main issue, (see McCormick on Evidence, sec. 39,) but the difficulty of the mental operation the law asks a juror to make in considering evidence for one purpose and not another does not convince us that convictions should be based on out-of-court

statements of witnesses who will not affirm these statements in a public proceeding. Accordingly, this court has refused to allow a conviction to be based solely on unsworn statements by witnesses (see *People v. Tate,* (No. 36481) *post,* 400; *People v. Newman,* (No. 37735) *post,* 411, or to permit such unsworn statements to be offered virtually for the purpose of using them as testimony. (*People v. Barragan,* 337 Ill. 531.) And, to lessen the risk of the properly admitted prior inconsistent statement of a witness being considered by the jury as testimony, this court has required that the impeachment not be repetitious (*People v. Moses,* 11 Ill.2d 84,) and that the jury be clearly cautioned and instructed to limit its consideration of such evidence for its proper purpose. *People v. Tunstall,* 17 Ill.2d 160."

This same language was quoted with approval in *People v. Collins* (1971), 49 Ill.2d 179, 194-95, in which we refused to follow a recent trend in other jurisdictions allowing use of prior inconsistent statements as substantive evidence, but our intention there was obviously not to restrict proper impeachment techniques. Indeed, to follow a rule as broad as that stated in *Tunstall* and *McKee* would allow a witness to lie with impunity on the stand, knowing that his previous statements could not even be used to reveal that his testimony was unreliable. Although we have recognized in *Paradise, Collins* and other cases that jurors have difficulty in considering evidence for one purpose and not another, we have never held that they cannot or should not be asked to do so. Rather, the whole import of our many decisions in this area is that every reasonable precaution should be observed by judges and lawyers to insure that prior inconsistent statements are used only for impeachment purposes and not improperly emphasized to the point that they will be viewed by the jury as substantive evidence. Courts should be alert to see that

limiting instructions are given and particular care is necessary where the prior statement bears directly on the defendant's guilt or innocence. In those situations it is evident that undue repetition or emphasis will be highly prejudicial. But at the same time, basic to our system of justice is the axiom that no witness, whether called by a party or the court, should be permitted to lie, and impeachment by prior inconsistent statements, when properly and fairly accomplished, has always been and remains a permissible means of demonstrating that he may have done so.