THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HAROLD D. PERSINGER, Defendant-Appellant.

Fifth District   No. 76-23

Opinion filed May 25, 1977.

James Geis and Victoria J. Meyers, both of State Appellate Defender's Office, of Chicago, for appellant.

Robert Stocke, State's Attorney, of Lewisville (Bruce D. Irish, of Illinois State's Attorneys Association, and James Sullivan, law student, of counsel), for the People.

Mr. PRESIDING JUSTICE CARTER delivered the opinion of the court:

The defendant, Harold D. Persinger, was charged by an indictment with the crime of conspiracy as follows:

"Harold Persinger on the 18th day of June, 1975 * * * committed the offense of conspiracy, in that he did with the intent to commit the offense of unlawful delivery of controlled substance in violation of Illinois Revised Statutes, 1975, Paragraph 1401(d) Chapter 56½, he agreed with Ida Frances Persinger to the commission of that offense and performed an act in furtherance of that agreement in that he obtained a prescription for less than 200 grams of a substance containing a derivative of barbituric acid, to-wit: Nembutal, and procured said controlled substance with his Public Aid Medical Card in violation of Illinois Revised Statutes, 1975, Paragraph 8—2(a), Chapter 38."

The defendant was tried by the court, without a jury, found guilty, and sentenced to a term of one year to 15 months. From this adverse judgment

the defendant argues on appeal that: (1) the State failed to prove beyond a reasonable doubt that the defendant entered into an agreement with Ida Persinger with the intent to commit the offense of unlawful delivery; and (2) it was an abuse of discretion for the trial court to deny the defense counsel's offer of proof that a key witness (Mary Scammahorn) had been treated for an overdose of drugs. For the reasons detailed below, we find neither of these arguments persuasive and affirm the judgment of the lower court.

The State's evidence consisted primarily of the testimony of witnesses who observed four controlled purchases of pills from Mrs. Ida Persinger at the Persinger residence; testimony from a pharmacist identifying bottles and pills which were sold by Mrs. Persinger as coming from his pharmacy; and the testimony of Mrs. Mary Scammahorn, the mother-in-law of the defendant's son.

There were four planned purchases of pills from Ida Persinger on the 12th and 15th day of May and on the 17th and 23d of June, 1975. The first three "buys" were arranged and made by Mary Scammahorn. On the 12th and 15th of May, Scammahorn was accompanied by an agent with the Illinois Bureau of Investigation (IBI) who stayed in a car, parked in the driveway, and observed Scammahorn while she purchased pills from Mrs. Persinger. There was no testimony as to the contents of the pills purchased. The defendant was seen by the IBI agent, at the time of the first buy, outside the house, in the back, and the agent never saw the defendant enter the house.

On June 17, 1975, Scammahorn was accompanied by another IBI agent (Rennacker) who entered the Persinger home with Scammahorn to purchase two bottles of pills which were later determined not to contain controlled substances. Rennacker did not see the defendant, although Agent Bowman of the surveillance team stationed outside of the Persinger home (150 to 300 feet away) observed an unknown white male enter the house.

At the time of the last transaction, June 23, 1975, Agent Rennacker went alone to the Persinger residence, while Deputy Thompson and IBI agent Sandusky surveyed the house. Upon arriving at the Persinger home, Agent Rennacker met Ida Persinger and both sat down together on the porch swing. There was a man standing on the porch identified by Agent Rennacker and Deputy Thompson as the defendant. Agent Rennacker testified that while she and Mrs. Persinger were on the porch swing, Mrs. Persinger took two pill containers out of her purse. Then, without addressing him by name, Mrs. Persinger asked the man Agent Rennacker identified as the defendant: "Can I borrow your pocket knife because I want to scratch the prescription off the container." The man gave Mrs. Persinger a pocket knife and immediately entered the house. Agent

Rennacker testified that she did not enter the house but observed the man she identified as the defendant for three minutes before he entered the house.

After removing the prescription label, Mrs. Persinger sold the pills to Agent Rennacker. The pills were analyzed and one bottle contained Nembutal, which contains Phenobarbital (a derivative of barbituric acid), while the other bottle contained no controlled substance.

Testimony was taken from Ray Cammon, a pharmacist, who described the process in which drugs were ordered and paid for by the Persingers. Mr. Cammon testified that on June 18, 1975, he filled three prescriptions on the Harold Persinger account: two bottles of Nembutal for Mrs. Persinger and one bottle of Librium for the defendant. Examining the two bottles of pills purchased by Agent Rennacker from Mrs. Persinger on June 23, 1975, Mr. Cammon identified them as Nembutal and Librium. Although the labels were partially scratched off, Mr. Cammon identified the bottle of Librium as coming from his pharmacy, whereas the bottle containing Nembutal only appeared to come from his pharmacy. Regarding the identification of the three bottles sold on May 12 by Mrs. Persinger to Mrs. Scammahorn, Mr. Cammon identified the bottles as "similar to the kind" used in his pharmacy, and stated the prescriptions were issued to the Persinger account January 27, March 25, and May 12, 1975. Mr. Cammon also identified the bottle of Librium pills Mrs. Persinger sold to Rennacker and Scammahorn on June 17, 1975 as having come from his pharmacy and that the prescription was made out to the defendant on March 25, 1975.

One of the principal witnesses for the State was Mary Scammahorn who testified that she bought sleeping, nerve, and pain pills from Mrs. Persinger at least once a week during 1974. She testified that Mrs. Persinger always sold the drugs to her and that the defendant was present "quite a few times." No drugs or pills were ever bought directly from the defendant by Mrs. Scammahorn.

In December 1974, Mrs. Scammahorn stopped buying pills from Mrs. Persinger, but still owed $60 for drugs bought "on credit." Seeing the Persingers at a bank on May 1, 1975, Mrs. Scammahorn told the Persingers she was not going to pay the $60. The defendant and his wife said that if she did not pay they would "get" her. It was then arranged that if Mrs. Scammahorn paid $10 the debt would be settled. Mrs. Scammahorn testified that upon demanding a receipt for the $10, the defendant replied, "You didn't give us a receipt for the pills." She paid the $10 and was given a receipt written by the defendant and signed by his wife.

The defendant testified in his own behalf stating that prior to his wife's plea of guilty to the offense of sale of a controlled substance, he had no knowledge of such sales. The prescription drugs were kept by his wife in

the bedroom and were under her charge. The defendant stated that he never observed that the labels were scraped off the bottles. Furthermore, he did not know the number of pills being used by himself and his wife "because * * * she takes them more often than I do."

Concerning the bank incident on May 1, 1975, the defendant said he asked Scammahorn for $10 which she owed to him and she requested a receipt. The receipt was signed by Mrs. Persinger because, according to the defendant, "she let her [Scammahorn] have the money."

Regarding the porch scene on June 23, 1975, the defendant stated he was with his wife on the porch and after drinking a soft drink, he went through the house and to the backyard to work on his truck. While walking through the house, the defendant heard a car and saw a woman drive into the driveway. Not knowing who the driver was, the defendant went to work on the truck, never knowing whether the driver got out of her car. Moreover, the defendant testified he did not hand his wife a pocket knife in the presence of Agent Rennacker.

The defendant argues that the evidence presented by the prosecution shows, at best, only his mere presence at the sale on June 23, 1975 and has established only his knowledge of the illegal conduct of his wife. Therefore, the evidence is insufficient to prove that the defendant entered into a conspiracy with his wife to commit the offense of unlawful delivery of a controlled substance in violation of section 401 of the Controlled Substances Act (Ill. Rev. Stat. 1975, ch. 56½, par. 1401(d)).

Conspiracy, because of its indefiniteness and comprehensiveness has often been the target for criticism. In *Krulewitch v. United States*, 336 U.S. 440, 445-59, 93 L. Ed. 790, 795-96, 69 S. Ct. 716, 719-20 (1949), Justice Jackson's concurring opinion referred to conspiracy as an "elastic, sprawling and pervasive offense, * * * so vague that it almost defies definition." See, *e.g.*, Johnson, "The Unnecessary Crime of Conspiracy," 61 Calif. L. Rev. 1137 (1937).

■■ Defining the mental state required for violation of the Illinois conspiracy statute (Ill. Rev. Stat. 1975, ch. 38, par. 8—2)[1] the Committee Comments note:

> "Since an agreement (by words, acts or understanding) is required, there must be (1) an intent to agree. And, the agreement must be accomplished with (2) an intent that the offense which is the object of the agreement be committed." (Ill. Ann. Stat. ch. 38, par. 8—2, at 459 (Smith-Hurd 1972).)

Thus the requisite *mens rea* elements are satisfied upon a showing of an

---

[1] A person commits conspiracy when, with intent that an offense be committed, he agrees with another person to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proven to have been committed by him or a co-conspirator. Ill. Rev. Stat. 1975, ch. 38, par. 8—2(a).

agreement to commit an offense with the intent that the offense be committed. (*People v. Graham*, 1 Ill. App. 3d 749, 752, 274 N.E.2d 370.) Furthermore, to satisfy the *actus reus* requirement, the prosecutor must show an act in furtherance of the unlawful agreement by either conspirator. *People v. Gordon*, 64 Ill. 2d 166, 355 N.E.2d 36.

It is frequently said that the "gist" or "essence" of a conspiracy is not the offense that is the object of the agreement, but the making of an unlawful combination of agreement. (*People v. Ambrose*, 28 Ill. App. 2d 627, 329 N.E.2d 11; *People v. McChristian*, 18 Ill. App. 3d 87, 309 N.E.2d 388, *aff'd*, 60 Ill. 2d 37, 322 N.E.2d 804.) Recognizing that few conspirators would memorialize the agreement in writing as a contract or even testify as to the existence of an agreement during trial, the courts retreat from precise statements concerning the need for an "agreement" to statements such as:

> (a) " 'A common design is the essence of the charge and if it be proved that the defendants pursued by their acts the same object, by the same means, one performing one part and one another, a conspiracy may be inferred if the evidence is sufficient.' " *People v. Sarelli*, 34 Ill. App. 2d 380, 385, 182 N.E.2d 722.
>
> (b) "The guilty knowledge which is an essential element of the crime * * * is rarely susceptible of direct and positive proof. It is sufficiently shown if it may be inferred from all the surrounding facts and circumstances involved in the transaction, including the acts and declarations of the accused concerning the same." *People v. Gates*, 29 Ill. 2d 586, 590, 195 N.E.2d 161, *cert. denied*, 377 U.S. 934, 12 L. Ed. 2d 298, 84 S. Ct. 1338.
>
> (c) "While a common design is the essence of a conspiracy, it is not necessary to prove that common design by direct evidence of an agreement between the conspirators. It is only necessary to show that they pursued a cause tending toward the accomplishment of the object of which the complaint is made." *People v. Perry*, 23 Ill. 2d 147, 155, 177 N.E.2d 323, *cert. denied*, 399 U.S. 910, 8 L. Ed. 2d 86, 90 S. Ct. 2199; *People v. Walczak*, 315 Ill. 49, 53, 145 N.E.2d 660.

■■■ In essence, because of the clandestine nature of a conspiracy and the foreseeable difficulty of the prosecution's burden of establishing the conspiracy by direct proof, the courts have permitted broad inferences to be drawn of the defendant's conspiratorial intent and agreement from evidence of acts, conduct, and circumstances. Attempting to mitigate the far-reaching effects of the conspiracy doctrine, the legislature requires, in addition to the requisite *mens rea*, that an overt act in furtherance of the conspiracy be shown. (Ill. Rev. Stat. 1975, ch. 38, par. 8—2.) However, this additional requirement rarely imposes any

substantial burden on the prosecution for just about any act in furtherance of the unlawful agreement will satisfy this element and this act need not be committed by a particular defendant so long as one of the co-conspirators was involved in the act. *People v. Ambrose*, 28 Ill. App. 3d 627, 329 N.E.2d 11; *People v. Olivier*, 3 Ill. App. 3d 872, 279 N.E.2d 363; *People v. Graham*, 1 Ill. App. 3d 749, 274 N.E.2d 370. See LaFave & Scott, Criminal Law 476-78 (1972).

■■ In order to convict the defendant of conspiracy, the State need only prove that the defendant, with the intent that the offense of sale of a controlled substance be committed, agreed with his wife to obtain the drugs and that an act was done in furtherance of that agreement. Since no direct evidence was presented of an agreement, our task is to see if there was sufficient circumstantial evidence to inferentially establish the existence of an "agreement" and not merely raise a suspicion as to its existence. (*People v. Link*, 365 Ill. 266, 6 N.E. 201, *cert. denied*, 302 U.S. 690, 82 L. Ed. 533, 58 S. Ct. 9.) Furthermore, the circumstantial evidence "must be such that the conclusion drawn from it excludes every reasonable hypothesis other than guilt." *People v. McChristian*, 18 Ill. App. 3d 87, 309 N.E.2d 388, *aff'd*, 60 Ill. 2d 37, 322 N.E.2d 804.

■■ From a careful examination of the record, especially considering evidence of the defendant's participation in the June 23, 1975, sale; statements to the effect that the defendant was often present when Scammahorn bought drugs; the statement made by the defendant in the bank on May 1, 1975 coupled with the receipt written by the defendant; as well as the quantity, frequency, and duration of the sales to Scammahorn, we believe that the cumulative effect of this evidence is sufficient to justify a finding of guilty on the conspiracy charge.

We emphasize, however, that mere knowledge, acquiescence, approval, or attempt on the part of one to perpetrate the illegal act does not constitute conspiracy. (*People v. Link*, 365 Ill. 266, 286, 6 N.E.2d 201, *cert. denied*, 302 U.S. 690, 82 L. Ed. 533, 58 S. Ct. 9.) Moreover, a conspiracy cannot be established by evidence of a mere relationship or transaction between the parties. *People v. Gates*, 29 Ill. 2d 586, 195 N.E.2d 161, *cert. denied*, 377 U.S. 934, 12 L. Ed. 2d 298, 84 S. Ct. 1338.) In situations, such as the one at bar, where knowledge might readily be demonstrated, it is nonetheless the finding of intent and an agreement which is required rather than mere knowledge. Although we make no intimations as to dredging up the common law doctrine that husband and wife are one person and therefore may not enter into a conspiratorial agreement between themselves, a doctrine rejected by *People v. Martin*, 4 Ill. 2d 105, 122 N.E.2d 245, we point to the early rationale for its existence, articulated in Mr. Chief Justice Warren's dissenting opinion in

*United States v. Dege*, 364 U.S. 54, 57-58, 4 L. Ed. 2d 1563, 1567, 80 S. Ct. 1589, 1593 (1960):

> "It is not necessary to be wedded to fictions to approve the husband-wife conspiracy doctrine, for one of the dangers which that doctrine averts is the prosecution and conviction of persons for "conspiracies" which Congress never meant to be included within the statute. A [husband], simply by virtue of the intimate life [he] shares with [his wife], might easily perform acts that would technically be sufficient to involve [him] in a criminal conspiracy with [her], but which might be far removed from the arm's-length agreement typical of that crime. It is not a medieval mental quirk or an attitude "unnourished by sense" to believe that husbands and wives should not be subjected to such a risk, or that such a possibility should not be committed to endanger the confidentiality of the marriage relationship."

Mention of the underlying policies for the common law doctrine is made only to suggest the extreme difficulties which exist in applying conspiracy theory to the marital relationship, especially when heavy reliance is made upon circumstantial evidence. If the courts mechanically apply conspiracy law in this area, the results reached will illustrate how a principle of law can operate harshly and produce what might seem to be unjust results in a particular case.

Forming the second issue on appeal, the defendant argues that the trial court abused its discretion when it refused the defense counsel's offer of proof that Mary Scammahorn had been treated for an overdose of drugs. The defense counsel made offers of proof of the testimony of four witnesses in order to contradict Scammahorn's denial of ever having been treated for an overdose of pills. Taken as a whole, the witnesses, according to the defendant, would have presented evidence showing that Scammahorn's drug usage was sufficient to cause her to overdose or "pass out," requiring emergency medical treatment. Further offers of proof were made and rejected in an attempt to show that Scammahorn was a drug user, and thus affecting her credibility.

The purpose of an offer of proof is merely to preserve on the record the nature of the offered evidence, to which an objection has been sustained so as to enable a court of review to determine if the ruling was erroneous. (*People v. Brown*, 27 Ill. App. 3d 569, 577, 327 N.E.2d 51.) Our function, therefore, is to see if the trial court erred by disallowing evidence as to Scammahorn's alleged "overdose" and the extent to which she was a drug user.

■■ During cross-examination, Scammahorn denied having been treated for an overdose of pills in 1974. The defense counsel's proposed

witnesses would have established the opposite and thus impeach Scammahorn by contradiction. Impeachment by contradiction "tends to show that [the witness] has erred or falsified as to certain particular facts, and is therefore capable of error or lying, and this should be considered negatively in weighing his other statements." (McCormick, Evidence §47, at 98 (2d ed. 1972).) However, the strength of this inference fluctuates depending upon the circumstances. Limitations on impeachment by contradiction have been established in Illinois by requiring that the subject matter of the impeachment may not be "collateral." (*People v. Watkins*, 23 Ill. App. 3d 1054, 320 N.E.2d 59.) The court in *Herget National Bank v. Johnson*, 21 Ill. App. 3d 1024, 1038, 316 N.E.2d 191, 194, enunciated the definition of collateral:

> "A witness may not be contradicted as to collateral, irrelevant or immaterial matters, and if a party brings out such matters on cross-examination, he may not contradict the witnesses' answers. (Citations). As to whether the matter is collateral within the rule the test is whether the party seeking to introduce it for purposes of contradiction would be entitled to prove it as part of his case or if it could be shown in evidence for any independent purpose. There are two classes of facts of which such evidence is admissible: (1) Facts relevant to some issue in the case under the pleadings; (2) facts admissible to discredit the witness as to interest, bias, motive, corruption, or the like. All matters not within these two classes are usually considered collateral."

■■ While it is apparent that testimony by the witness elicited during direct or cross-examination concerning recent use of drugs may have an important effect on the witness' credibility (*People v. Garrett*, 44 Ill. App. 3d 429, 358 N.E.2d 364; *People v. Strother*, 53 Ill. 2d 95, 99, 290 N.E.2d 201), this does not always mean that proposed extrinsic evidence escapes the prohibition against contradiction by collateral facts. The defense counsel seeks to parade a number of witnesses before the court to contradict Scammahorn's denial of ever having overdosed. Her denial was elicited on cross-examination, and concerned a specific prior act showing misconduct which was unrelated to a material issue. (*Fugate v. Sears, Roebuck & Co.*, 12 Ill. App. 3d 656, 674, 299 N.E.2d 108.) Thus, the cross-examiner is bound by her answer and cannot produce extrinsic evidence to contradict the witness because the offered testimony does not fall within the first or second categories of facts specified in *Herget National Bank v. Johnson*, at 1038. (*People v. Steptore*, 51 Ill. 2d 208, 281 N.E.2d 642; *Dimick v. Downs*, 82 Ill. 570, 573 (1876); 3A Wigmore, Evidence §987(2) (Chadbourn rev. 1970); McCormick, Evidence §47 (2d ed. 1972).) Were the rules otherwise, presenting such evidence would

only create a side show, diverting attention from the main issues, confusing the issues, and wasting time.

■■ Concerning defense counsel's offer of proof that would have shown that Scammahorn was at one time a drug user, there was no abuse of discretion in excluding the proffered evidence as it would have been cumulative and repetitious. (*People v. Sims*, 74 Ill. App. 2d 352, 220 N.E.2d 3.) Scammahorn had already admitted, on direct examination, that she purchased sleeping, pain, and nerve pills at least once a week from Mrs. Persinger in 1974. On cross-examination Scammahorn acknowledged consuming all the pills, numbering in the hundreds, she bought from Mrs. Persinger. Furthermore, she received pills from two doctors and was unable to state exactly how many pills she would take a day. The admission of the proposed testimony would have amounted to nothing more than a lengthy repetition of what was already known, freely admitted, and uncontested.

Accordingly, the judgment of the Circuit Court of Clay County is affirmed.

Judgment affirmed.

KARNS and EBERSPACHER, JJ., concur.