THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES PERRUQUET *et al.*, Defendants-Appellants.

Fifth District   No. 5—86—0803

Opinion filed August 18, 1988.

Robert Agostinelli and Thomas A. Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant James Perruquet.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant Mark Vreland.

Charles Garnati, State's Attorney, of Marion (Kenneth R. Boyle,

Stephen E. Norris, and Kathy J. Geer, all of State's Attorneys Appellate Prosecutor's Office, and Frank Weiss, of River Grove, of counsel), for the People.

JUSTICE CALVO delivered the opinion of the court:

A jury found defendants James Perruquet and Mark Vreland guilty of burglary and conspiracy to commit burglary. Defendants on appeal argue that their burglary convictions must be reversed because the State failed to prove beyond a reasonable doubt that they had the requisite intent to commit burglary. Defendants also argue that their conspiracy convictions must be reversed because the State failed to show an agreement between the two defendants to commit burglary. Finally, defendants argue that if their convictions for burglary are affirmed, their convictions for conspiracy must be reversed because they cannot be convicted of both the principal and the inchoate offense.

The State's witnesses, Charles Stilley, owner of Stilley's Used Furniture, Betty Polbinski, a store employee, and Roy Martin, a Royalton police officer, testified to the following facts. Defendants allegedly stole cash from Stilley's Used Furniture Store in Energy, Illinois, on May 10, 1986. The store is 30 feet wide and 100 feet long, with three doors on the north side of the store which lead to the parking lot. The inside of the store is divided into three sections. The easternmost section is a storage room which is walled off from the rest of the store except for a door. One of the doors to the parking lot is in the storage room, and a workbench is along the same wall. The partition between the other two sections of the building has been knocked down and a square furnace sits along the line of the partition. The westernmost section contains the store's counter, which is near the south wall. The front two sections of the store are visible from the counter, except where the furnace blocks the view. The counter contains a wooden cash drawer which cannot be seen from the side of the counter where the customers are located. The drawer can only be released by a latch under the counter which is also not visible from the customer side of the counter. The metal compartment of the cash drawer is placed in the store's safe each night. When the store is opened each morning the compartment is put back into the drawer, but all of the money except one $10 bill, two $5 bills and ten $1 bills, remains in the safe.

On May 9, 1986, Perruquet and his wife came to the store and Stilley showed them an air conditioner for sale on the floor in the storage room near the workbench. The Perruquets did not buy the air

conditioner at that time. Stilley testified that the storage room may have contained some wire. On May 10, 1986, Polbinski opened the store at 9 a.m. Stilley, either before or after Polbinski arrived, prepared the cash drawer. He also told Polbinski that a couple had looked at the air conditioner the day before and he stated that they might return. Stilley left the store before any customers arrived.

At about 9:20 a.m., the two defendants entered the store and told Polbinski that they wanted to measure the air conditioner. Polbinski led them to the storage room. After Perruquet measured it, he stated that it would fit his window, and therefore he offered to buy the air conditioner. One of the defendants drove the car around to the door between the storage room and the parking lot. Polbinski unlocked the door, waited until the defendants finished loading the air conditioner into the trunk of the car, and relocked the door.

Polbinski and the defendants then walked from the storage room to the front counter. The air conditioner cost a total of $159, and Perruquet gave Polbinski two $100 bills to pay for it. Polbinski gave Perruquet the entire $30 in the drawer, but because the drawer did not have enough money, she also took out her purse from under the counter and gave Perruquet an additional $11 from her wallet. She put her purse back under the counter. Next, Polbinski prepared a receipt which consisted of two copies, one for the store and one for Perruquet. Polbinski asked Perruquet to write his name and address on the receipt. Perruquet wrote the name "James Davis" and the address "100 Dean Street, Royalton," Illinois, on the receipt. Polbinski filled out the rest of the receipt and handed Perruquet his copy.

Perruquet then asked Polbinski whether the storage room contained anything with which to tie down the trunk of the car. Polbinski replied that she did not know, but that she would look. She asked Perruquet to go with her, but Perruquet told Vreland to accompany her. Perruquet remained at the counter. No other customers were in the store and the front counter could not be seen from the storage room. Polbinski became suspicious so she returned to the counter and Vreland followed her. They did not find any wire to tie down the trunk, and Polbinski testified that she had never seen spools of wire in the store. As Polbinski returned to the counter she saw her wallet on top of it. Defendants left the store and Polbinski did not hear them say anything or see them exchange any kind of signal. When Polbinski checked her purse she noticed $40 missing, and she only found $13 in $1 bills and change in the drawer.

Polbinski notified the police and gave them a description of the defendants and their car. She described the car as old and green. The

Energy police contacted Martin and told him to look for a dark green over light green Ford, Buick or Oldsmobile. Martin knew that the house at 100 Dean Street had been vacant for awhile, so he rode around Royalton in search of the car. Martin discovered the car about an hour later at the home of James Burdette. Burdette was standing next to the car, Vreland was sitting in the front passenger seat, and the owner of the car, Donald Roder, was looking under the hood. Martin also drove by Perruquet's residence and saw an air conditioner on the porch. The Energy and Royalton police subsequently questioned both defendants.

Perruquet testified that he had a previous conviction for murder and deviate sexual assault, but was on parole as of 1983. Perruquet, his wife, Desiree, and their son previously lived at 100 Dean Street and that address was on Perruquet's driver's license, but they moved to 212 Cleveland Street, where they lived at the time of the alleged burglary. Perruquet testified that he did not buy the air conditioner on May 9 because he did not know whether it would fit in his window. Perruquet stated that he and Vreland drove Desiree's goldish-brown Chevrolet Impala, not Roder's green Ford, to the store on May 10. Once inside the store, the defendants and Polbinski went to the storage room. After Perruquet measured the air conditioner and decided to buy it, he asked Vreland to drive the car around to the back of the store. Perruquet and Polbinski then went to the counter, where he gave her two $100 bills and she gave him the entire $41 in change from her purse because she said Stilley had not left her enough money for change. Perruquet testified that he did not remember seeing a cash drawer.

Perruquet testified further that he then filled out the receipt with the name "James Davis" instead of James David Perruquet. Perruquet stated that he intended to write "James David" on the receipt and that he told Polbinski of his intent. According to Perruquet, Polbinski said she approved of this action because the receipt would just prove that the sale took place. In the meantime, Vreland had re-entered the front of the store. Polbinski got the keys to the back door and the three of them went to the storage room, where the two defendants put the air conditioner into the trunk of the car. Perruquet testified that the air conditioner was too large so they angled it in. Perruquet stated that Vreland drove the car around to the front of the store while he talked with Polbinski about tables. Polbinski then talked to two older ladies who were near the front of the store. Perruquet also stated that a lady with a young girl stood near the counter looking at lampshades.

Vreland reentered the store and after Polbinski finished talking with the two ladies, he asked her for rope or wire to tie down the trunk. She and Vreland walked to the storage room to look for the rope or wire while Perruquet remained in the middle section of the store looking at beds. Perruquet did not go near the counter. Polbinski returned about one minute later, and Vreland returned with her carrying a green spool of wire. Vreland tied down the trunk while Perruquet talked to Polbinski about king-sized beds. Vreland gave the spool to Polbinski, and he and Perruquet left the store about 9:45 a.m. Perruquet testified that he did not take any money from the store. Perruquet and Vreland then drove to West Frankfort to get some breakfast and shop for groceries. They returned to Royalton around noon and put the air conditioner in Perruquet's house.

Vreland's, Roder's and Desiree's testimony corroborated Perruquet's testimony. Vreland, who had a prior conviction for misdemeanor theft, testified that he and Perruquet used Desiree's car to pick up the air conditioner. Vreland saw four other people come into the store after he and Perruquet arrived. Two women stood by the counter, and a woman with a girl stood near the front door looking at window shades. Vreland did not witness the payment for the air conditioner. Vreland testified that Polbinski found the spool of wire on the workbench. Vreland also testified that he and Perruquet returned to Royalton around 1 p.m. after being in West Frankfort. Vreland did not join Roder and Burdette in the green car until later that afternoon. Vreland denied taking any money at the store.

Roder testified that he worked on Burdette's brown Pinto on May 10 and drove his green Ford to West Frankfort to buy some parts. He then returned to Burdette's house in Royalton that same day. No one else drove the green Ford on May 10. Roder borrowed a tool from Vreland's mother at 12:30 p.m. or 1 p.m. and Vreland walked back to Burdette's house with Roder at that time. No police officer talked to Roder until 2 p.m. or 3 p.m. when Kenneth Ingersol, the Energy police chief, questioned Roder. Desiree testified that Perruquet and Vreland used her car and returned with the air conditioner about 10 a.m. About 12 days later, while cleaning out the trunk of her car, she found a piece of wire. She testified that Perruquet told her that he had thrown the wire used on May 10 into the trunk.

■ "A person commits burglary when without authority he [or she] knowingly enters or without authority remains within a building *** or any part thereof, with intent to commit therein a *** theft." (Ill. Rev. Stat. 1985, ch. 38, par. 19—1.) The State must prove not only that the defendant entered without authority, but also that the

defendant possessed a larcenous intent at the time of entry. (*People v. Weaver* (1968), 41 Ill. 2d 434, 439, 243 N.E.2d 245, 248.) The authority to enter the building of a business open to the public extends only to people who enter with a purpose consistent with the reason the business is open. (*Weaver*, 41 Ill. 2d at 439, 243 N.E.2d at 248.) Thus, an authorized entry does not extend to one who enters a business with the intent to commit a theft (*Weaver*, 41 Ill. 2d at 439, 243 N.E.2d at 248), or to one who enters a business both to transact business and to steal (*People v. Stager* (1988), 168 Ill. App. 3d 457, 460, 522 N.E.2d 812, 814). When the burglary involves a public building, therefore, "the element of entry without authority need not be established apart from the element of entry with intent to commit a theft." (*People v. Boose* (1985), 139 Ill. App. 3d 471, 473, 487 N.E.2d 1088, 1090.) Furthermore, a criminal intent formed after the entry does not provide the requisite intent for a burglary, because the defendant must have formed his or her intent prior to entry of the building. (*Weaver*, 41 Ill. 2d at 439, 243 N.E.2d at 248.) If defendants' "presence in the store [was] as consistent with [their] innocence as with [their] guilt of the criminal intent at the time of [their] entry" (*People v. Kelley* (1916), 274 Ill. 556, 558, 113 N.E. 926, 927), the State failed to prove beyond a reasonable doubt that they had the requisite intent at the time they entered the store.

■ Defendants argue that they cannot be guilty of burglary because the State failed to prove that their entrance was unauthorized or that they had the requisite intent. They assert that, at the most, they took advantage of an opportunity to steal after they entered the store. Both defendants contend that even if one or both of them stole the money, the State did not prove that they entered the store for any purpose other than to purchase the air conditioner or that they had the intent to steal when they entered the store. We agree.

Only Perruquet and his wife entered the store the day before the alleged burglary. They looked at the air conditioner, expressed concern at its size and stated that they might purchase it the following day. The Perruquets did not purchase anything that day and the State presented no evidence that Perruquet knew of the location of the cash drawer or that the drawer could only be released by pulling a latch under the counter. Inasmuch as Stilley worked at the store on May 9, Perruquet did not know, and the State did not present any evidence that Perruquet knew, that Polbinski would be at the store the following day or that her purse would be accessible.

When Perruquet and Vreland entered the store on May 10, they measured the air conditioner and loaded it into the trunk of their car.

Polbinski did not testify as to whether the air conditioner fit in the trunk. The State asserts that the trunk of defendants' car could accommodate the air conditioner. Although Martin testified that the trunk of the green Ford was larger than that of Desiree's car, the State presented no evidence that the air conditioner actually fit into either trunk. The State also presented no evidence to contradict defendants' testimony that they needed something with which to tie down the trunk. When defendants asked for some rope or wire, Polbinski helped them find it and did not dispute that they needed it. Thus, based on the evidence, defendants' request for rope or wire could have been legitimate and not just a ploy to get Polbinski away from the counter.

When Perruquet filled out the receipt he used a name—James Davis—very close to his own name, James David Perruquet. He also put his former address on the receipt—an address that still appeared on his driver's license. Perruquet testified that he knew he needed the receipt to return the air conditioner, so the name and address on the receipt would have closely matched his driver's license if he also had to present the license to verify his identification upon returning the air conditioner. Nevertheless, the receipt provided the first indication that Perruquet intended to steal the money. This action occurred after he and Polbinski completed the sale of the air conditioner and well after his entry into the store. Thus, the inaccurate information on the receipt can hardly be evidence that Perruquet intended to steal the money prior to entering the store. The State contends that because Perruquet filled out the fictitious information on the receipt before paying for the air conditioner, we can infer that he saw the cash drawer the day before and thus planned to commit the theft prior to entering the store on May 10. Both Polbinski and Perruquet, however, testified that Perruquet paid for the merchandise *prior* to filling out the receipt. Thus, Perruquet could have formed the intent to steal and incorrectly filled out the receipt, after seeing the cash drawer and Polbinski's purse when he paid for the air conditioner.

When Polbinski returned to the counter after looking for some wire, the defendants left the store. Polbinski testified that she did not see any signal pass between the defendants, and she could not say how fast they left. Consequently, her testimony does not support a conclusion that the defendants fled or that their exit from the store was out of the ordinary or consistent with a theft having just occurred. The State presented no evidence to infer otherwise.

We believe *Kelley* (274 Ill. 556, 113 N.E. 926), *People v. Vallero* (1978), 61 Ill. App. 3d 413, 378 N.E.2d 549, and *Boose* (139 Ill. App.

3d 471, 487 N.E.2d 1088) are factually similar and support our conclusion. The State contends that these cases are distinguishable because the defendants in those cases did not enter the businesses the day before the theft as did defendants in the case at bar. As we pointed out earlier, however, nothing happened on May 9 to indicate that Perruquet received any information with which to plan the burglary and form the intent to steal prior to his entry on May 10. We also do not believe that this case hinges on the credibility of the witnesses. Even considering the facts as set forth by the State's witnesses, the State did not present enough evidence to prove that defendants possessed the requisite intent upon entering the store.

The State also argues that although Perruquet may have made an authorized entry into the store, he did not have authority to enter a portion of the store—the area behind the counter. The State asserts that the counter formed an enclosure within the store not open to the public. Thus, Perruquet did not commit burglary until he reached behind the counter, and he could have formed the requisite intent for burglary any time prior to entering the counter area. He, therefore, could have formed the intent while inside the store.

The State cites *People v. Davis* (1977), 54 Ill. App. 3d 517, 369 N.E.2d 1376, for support of this proposition. We find *Davis* inapplicable for two reasons. First, that case did not involve a counter area in a store. In *Davis*, two businesses occupied one large room which had one outside entrance. Community Action Depot occupied the front part of the room near the door and Consolidated Construction Company occupied the back part of the room. The connecting doorway between the two offices was 5 to 15 feet wide, but there was no door. Community Action Depot was open to the public, while Consolidated Construction Company was a private enterprise. Defendant in *Davis* allegedly entered the room through the unlocked front door, proceeded through the Community Action Depot office and the doorway between the two businesses, and stole a typewriter from Consolidated Construction Company. The court held that although the defendant made an authorized entry through the front door, because Community Action Depot was open to the public, defendant made an unauthorized entry through the doorway into Consolidated Construction Company. (*Davis*, 54 Ill. App. 3d at 522-23, 369 N.E.2d at 1381-82.) Thus, although defendant's unauthorized entry was only to a part of the entire building, he still entered an entire business, only accessible by one doorway, without authority. In the case at bar, the State attempts to define an area within a business, only segregated by a counter, as a separate part of the building. This is a significantly different factual

situation than that in *Davis*.

The second problem with *Davis* is that in that case the State charged that the defendant "knowingly and without authority 'enter[ed] into part of' the building." (*Davis*, 54 Ill. App. 3d at 519, 369 N.E.2d at 1379.) In the case at bar, the State, by information, charged that defendants "knowingly entered a building of Charlie Stilley, d/b/a Stilley's Used Furniture *** with the intent to commit therein a theft." The State now wishes to change the theory of its case—a theory which defendants point out they did not have the opportunity to defend against at trial. The State charged that defendants had the intent to commit the theft upon entering the store itself. It cannot now seek to convict defendants on a different basis; namely, that they only entered a part of the building with intent to commit a theft. Consequently, although burglary can be committed by entering a building "or any part thereof" (Ill. Rev. Stat. 1985, ch. 38, par. 19—1), we hold that the counter area was not a part of the building as defined by statute and *Davis* does not support a contrary conclusion. Moreover, the State was precluded from succeeding on this theory because it did not charge defendants with unauthorized entry of only part of the building. Therefore, the State failed to prove beyond a reasonable doubt that Perruquet entered the store without authority or formed the intent to steal prior to entering the building.

■■ ■ There is even less evidence to indicate that Vreland is guilty of burglary. One may be guilty of an offense if he or she solicits with, aids in, abets, agrees to or attempts to aid another in the planning or commission of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).) Mere presence at the scene of the crime, even with knowledge that a crime has been committed, however, is not enough. (*People v. Thompson* (1975), 35 Ill. App. 3d 105, 107, 340 N.E.2d 631, 632.) As we pointed out earlier, the State did not present any evidence that Vreland did not need the wire to tie down the trunk. Thus, Vreland could have gone to the storage room with Polbinski to obtain the wire, rather than to distract Polbinski so that Perruquet could steal the money. Even if Perruquet used Vreland to distract Polbinski, the State did not present any evidence that Vreland knew of Perruquet's plan. Polbinski testified that Perruquet suggested that Vreland help her look for the wire; Vreland did not volunteer to help her look for it. See *People v. Wright* (1976), 43 Ill. App. 3d 458, 357 N.E.2d 224 (defendant not guilty of theft even though defendant occupied gas station employee's attention outside while three of defendant's automobile passengers entered the station and stole money from the cash register).

The record revealed that the air conditioner was large, so Perruquet could have needed help carrying it. Thus, Vreland had a legitimate reason for being with Perruquet at the store. The State asserts that Vreland's accountability is evidenced by his driving the getaway car. No one testified, however, to who drove the car away from the store. Furthermore, both defendants left the store together, according to Polbinski, and thus Vreland did not wait in the car until Perruquet came out of the store so that they could make a fast escape.

The State also presented no evidence that Vreland had the intent to commit the theft at the time he entered the store. Vreland did not even enter the store the day before the theft as did Perruquet. Vreland did not fill out the receipt and Vreland did not volunteer to accompany Polbinski to the storage room. Thus, nothing Vreland did indicated that he intended to commit the theft before he entered the store. Consequently, the State failed to show beyond a reasonable doubt that Vreland aided Perruquet in the planning or commission of the offense, or that Vreland possessed the intent to commit a theft when he entered the store.

■ Likewise, we hold that the State failed to prove Perruquet and Vreland guilty of conspiracy to commit burglary beyond a reasonable doubt. In order to be convicted of conspiracy to commit burglary a person must intend to commit burglary, agree with another to commit burglary, and perform an act in furtherance of the agreement. (Ill. Rev. Stat. 1985, ch. 38, par. 8—2(a).) Mere knowledge of, acquiescence in, approval of, or attempt to commit the illegal act, or evidence of a relationship or transaction between the parties does not constitute conspiracy. *People v. Persinger* (1977), 49 Ill. App. 3d 116, 122, 363 N.E.2d 897, 902.

■ Because burglary involves an unauthorized entry, the State had to show that Perruquet and Vreland formed their intent prior to entering the store. As we have already explained, the State failed to prove this beyond a reasonable doubt. The State also provided insufficient evidence of an agreement between Perruquet and Vreland. Because the State did not present any direct evidence of an agreement, the circumstantial evidence "must be such that the conclusion drawn from it excludes every reasonable hypothesis other than guilt." (*Persinger*, 49 Ill. App. 3d at 122, 363 N.E.2d at 901-02, quoting *People v. McChristian* (1974), 18 Ill. App. 3d 87, 91, 309 N.E.2d 388, *aff'd* (1975), 60 Ill. 2d 37, 322 N.E.2d 804; *People v. Ramirez* (1986), 151 Ill. App. 3d 731, 733-34, 502 N.E.2d 1237, 1238.) The State, however, correctly points out that *People v. McNair* (1981), 102 Ill. App. 3d 322, 331, 429 N.E.2d 1233, 1239, does not require the State to ex-

clude every reasonable hypothesis consistent with innocence. Nevertheless, we believe that *Persinger* and *Ramirez* are more accurate reflections of the law. After the *McNair* court rejected the reasonable hypothesis rule, it then quoted *People v. Foster* (1979), 76 Ill. 2d 365, 374, 392 N.E.2d 6, 9, for the proposition that the jury need not establish a defendant's guilt beyond a reasonable doubt as to each link in the chain of circumstances; it is sufficient if the jury establishes a defendant's guilt beyond a reasonable doubt when considering all of the evidence and circumstances together. (*McNair*, 102 Ill. App. 3d at 331, 429 N.E.2d at 1239.) Our review of *Foster* reveals that the court in fact endorsed the reasonable hypothesis rule. The *Foster* court held that the State did not fail "to exclude every reasonable hypothesis consistent with innocence." (*Foster*, 76 Ill. 2d at 373, 392 N.E.2d at 9.) The *Foster* court merely clarified this rule by stating that the jury can establish guilt beyond a reasonable doubt by considering all of the evidence together. (*Foster*, 76 Ill. 2d at 374, 392 N.E.2d at 9.) Thus, the reasonable hypothesis rule is still valid.

Despite the reasonable hypothesis rule, the courts have allowed broad inferences to be drawn from the circumstances and acts of the parties because of the difficulty in proving an agreement by direct proof. (*People v. Mordick* (1981), 94 Ill. App. 3d 497, 500, 418 N.E.2d 1057, 1059.) Nevertheless, we hold that the evidence did not establish an agreement between the defendants. Vreland did not go with Perruquet to the store the day prior to the theft. Perruquet asked Vreland to accompany him in order to pick up the air conditioner. Testimony revealed that the air conditioner was large, and thus it was possible that Perruquet needed Vreland to help carry it. According to Polbinski, Perruquet asked her for the wire. When she asked Perruquet to go with her to the storage room to look for the wire, he told Vreland to go. Thus, even the testimony from the State's witness did not show that Perruquet and Vreland had arranged to distract Polbinski. Even if Perruquet had intended, either before or after entering the store, to use Vreland to distract Polbinski, the evidence did not show that Vreland knew of or agreed to Perruquet's plan.

Polbinski also testified that she did not see any signal pass between the two defendants before they left the store. Although the State asserts that the lack of a signal proves that the defendants planned the theft in advance, we agree with the defendants that the presence of a signal would have been more proof that the defendants had an agreement between themselves. The defendants could have properly left the store when they did without a word because the transaction was completed. The evidence failed to negate every rea-

sonable hypothesis of innocence (see *Mordick*, 94 Ill. App. 3d 497, 418 N.E.2d 1057; *People v. McLaughlin* (1984), 121 Ill. App. 3d 1080, 1084, 460 N.E.2d 787, 790), and consequently, the evidence did not establish beyond a reasonable doubt that the defendants agreed to commit burglary.

Accordingly, we reverse defendants' convictions for burglary and conspiracy to commit burglary. Because we are reversing defendants' convictions, we need not consider the third issue they raise on appeal.

Reversed.

HARRISON, P.J., and LEWIS, J., concur.