THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD HOPKINS, Defendant-Appellant.

Fourth District   No. 4—91—0711

Opinion filed May 20, 1992.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In July 1991, a jury convicted defendant, Ronald Hopkins, of burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—1(a)), and he was later sentenced to seven years in prison. Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) as applied in this case, the burglary statute unconstitutionally created a mandatory presumption of an essential element of the crime; (3) the trial court improperly admitted evidence showing he had been fingerprinted in another county under another name; and (4) the sentencing order was defective for failing to specify the number of days of credit defendant was due for time he served in pretrial custody.

We affirm and remand with directions.

## I. Facts

The State's case rested almost entirely upon the testimony of Ronald C. Wells, who testified that he owned the Central Supply Company in Bloomington. His business sold maintenance and cleaning supplies. The store is approximately 5,000 square feet and includes a showroom and display area. The store's cash register was located about 30 feet from the front door.

Between noon and 1 p.m. on August 30, 1990, Wells was working alone in the store when a black man and a black woman in their for-

ties came into the store, looked around, and asked questions of Wells regarding the store's merchandise. At first, they conversed near the cash register, but as the three of them talked further and Wells showed them various products displayed on a far wall, they had walked approximately 30 feet from the cash register. At that point, a display area 12 to 15 feet long, 3 feet wide, and 5 feet tall stood between Wells and the cash register.

As Wells and the other two people spoke, a third person, another black male, walked into the store. Wells noted that the third person was wearing a red baseball cap. Because Wells was helping the other "customers," he did not initially pay much attention to the third person. However, after "about a minute," he looked over to see what the third person was doing and noticed him behind the counter on which the cash register sat, stooping down as if hiding behind the counter. The cash register drawer was open and the man's hand was pulling on the cash drawer. Wells could see all of this by looking over the top of the five-foot display between him and the cash register. Wells could see the person's head and described the person's hand on the cash drawer as making "a graspy motion."

Wells yelled, "What are you doing behind my counter?" He then walked toward the cash register, picked up a telephone on the way, said "I'm calling the law," and proceeded to dial 911 to summon the police. The telephone was within five feet of the cash register. At that point, the person behind the cash register ran from behind the counter and walked out the front door.

Wells then walked over to the other two people who were still in the store and asked them if they knew the third person or "if they were involved in it." They told Wells, "Oh no, oh, no. We don't know that person and we're getting out of here. We don't want to get involved in this." They then left the store within about 10 seconds after the third person had left. Wells followed them outside and within another 10 seconds a police car drove up. Wells told the officers what had happened and pointed out the two people to whom he had been showing products, who were then walking up the street, about a block and a half away. The police left Wells and soon returned to the store to bring Wells to a location where a car had been stopped.

The police asked Wells if he recognized the people in the car. The car contained four people, and Wells identified the two people seated in the back seat as the two who entered the store first. Wells also identified the passenger in the front seat as the person Wells saw with his hand in the cash register drawer. Wells did not recognize the driver.

Wells identified defendant as the person who had gone behind the counter and opened the cash register. Although defendant was wearing a blue baseball cap in the car, Wells noted that defendant had worn a red baseball cap in the store.

As Wells watched, a police officer asked defendant to get out of the car and then searched it. The officer found a red baseball cap under the front passenger seat. When the officer showed the cap to Wells, he identified it as the same type of baseball cap that defendant had been wearing in the store. Wells also identified the cap at trial when it was introduced as an exhibit.

Wells testified that defendant and his confederates never attempted to buy anything in the store. Regarding the question of defendant's authority to enter the business, Wells testified as follows:

"Q. [The prosecutor]: Did you ever give the Defendant permission or authority to enter your business for the purpose of stealing anything?

A. [Mr. Wells]: No.

Q. Your business is a retail store, is it not?

A. Yes.

Q. Sells to customers off the street?

A. Yes, mm-hmm.

Q. And would the general public have authority to enter your store for the purpose of buying products?

A. Yes.

Q. Would you give anyone permission to enter your store for any other purpose, such as stealing?

[Defense attorney]: I'd object, Your Honor. That's a leading question.

THE COURT: Well, he's answered the question, sustained.

[The prosecutor]: I'm sorry?

THE COURT: He answered a question earlier that he said he didn't give him authority to do so."

On cross-examination, Wells further testified as follows:

"Q. [Defense counsel]: *** [W]hen we say—or I say that you're open for business, you're actually inviting people to come into your business, are you not?

A. [Mr. Wells]: Yes.

Q. You're hoping they'll come in?

A. Yes, I am.

Q. Do you have any signs posted in the building or in the front of the building that would indicate no thieves have authority to enter this building?

A. No.

Q. Okay. So a normal individual approaching your building, seeing that it's a retail establishment that is open for business, would assume that he can walk right on in?

A. Yes."

Officer Albert Emery of the Bloomington police department testified that while on patrol on August 30, 1990, he responded to the call from Central Supply Company. When Emery arrived, Wells pointed out two people walking down the street who had just left the business. Emery pursued them and saw them get into a car. Emery stopped the car just as it started to pull out of a parking lot. He then directed another officer to bring Wells to that location. When Wells arrived, he identified three of the people in the car as having been in his store. Wells also identified the defendant as the man who had had his hand on the cash drawer. Emery searched the car after its occupants got out, and he found a red baseball cap under the front seat on the passenger side, where defendant had been sitting.

Emery arrested defendant and took him to the Bloomington police station to book him. While there, Emery asked defendant for his name, address, and other pertinent information. Defendant told Emery that his name was Leon Scott, and he signed the back of the booking sheet as Leon Scott.

Officer Randall McKinley testified that he is a detective with the Bloomington police department who has been trained in the examination of latent fingerprints and rolled fingerprints for purposes of identification and classification. McKinley testified that in November 1990 he received a set of rolled fingerprints "from St. Louis County" under the name of Ronald Hopkins, which he then compared to the fingerprints from defendant under the name of Leon Scott. McKinley determined that the fingerprints of Leon Scott obtained from defendant's booking card in the present case were the same as the fingerprints of Ronald Hopkins.

The State presented no further evidence, and the defense presented no evidence at all. The jury convicted defendant of burglary.

## II. Sufficiency Of The Evidence

Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt. He notes that the burglary statute, in pertinent part, reads as follows: "A person commits burglary when without authority he knowingly enters *** a building *** with intent to commit therein a *** theft." (Ill. Rev. Stat. 1989, ch. 38, par. 19—1(a).) Citing *People v. Perruquet* (1988), 173 Ill. App. 3d 1054, 1063-

64, 527 N.E.2d 1334, 1340-41, defendant argues that the State failed to prove that at the time he entered the store, he intended to commit a theft. According to defendant, we should conclude instead, as did the *Perruquet* court, that defendant could have entered the store for the purpose of looking at or purchasing merchandise and *then* formed the intent to open the cash register and steal money therefrom.

■ The issue of defendant's intent at the time he entered the store, as well as the issue we discuss later of whether he had authority to enter the store, arises because the State charged defendant with the burglary in circumstances when the "burglarized" store was otherwise open for business. In more traditional (and common) burglary cases—those involving breaking into locked homes or businesses, usually at night, and stealing property located therein—no issue normally arises regarding whether the accused burglar either had authority to enter the burglarized premises or did so with the intent to commit theft. Typically, the owner of the burglarized premises testifies that the accused burglar had no authority to enter, and most burglary defendants do not even challenge that assertion. Further, in most burglary cases, property has been stolen from the locked premises by whoever broke in, typically making crystal clear what almost everyone would conclude anyway: that the burglar broke in with the intent to steal property located within those premises and succeeded in doing so.

The burglary charge before the court in this case is not typical because it involves no locked doors and no entry by stealth. Instead, this charge involves a retail establishment, open for business at the time of the alleged burglary, which invited potential customers to come in off the street, look around at the stocks within, and (the store's owner hopes) make a purchase. As shown by defendant's arguments in the present case, this charge of burglary—commonly known throughout central Illinois as a "Jones burglary"—often raises serious questions regarding both the accused burglar's intent to steal at the time he entered the store and his lack of authority to enter.

The circumstantial evidence in this case strongly suggests a preconceived plan to steal money from the cash register. The two people who first entered the store did so simply to serve as a distraction for defendant's later activities at the cash register. Although Wells was not certain about how much time passed from the point at which defendant entered the store until Wells saw him at the cash register, Wells estimated that period as "about a minute." Further, defendant upon entry never spoke or attempted to speak to the only three people in the store; he apparently proceeded immediately and directly to

the cash register, crouched behind the counter on which it was located, and opened its cash drawer.

Other circumstances also strongly support the jury's inference of defendant's intent to steal upon entry: (1) defendant's two confederates denied knowing him even though they were found within minutes after that denial sitting in the same car with him; (2) defendant immediately ran out of the store upon being confronted by Wells; (3) in the few minutes that elapsed from the time defendant ran out of the store until Wells saw him as a passenger in the car, defendant had hidden the red baseball cap he had worn in the store under the front seat of the car and had put on a blue baseball cap, suggesting thereby that he hoped to confuse anyone who might try to identify him; and (4) defendant gave a false name when the police booked him at the police station.

The State can prove a defendant's intent by inferences drawn from his conduct and from surrounding circumstances. (See *People v. Richardson* (1984), 104 Ill. 2d 8, 12-13, 470 N.E.2d 1024, 1026-27; *People v. Fisher* (1980), 83 Ill. App. 3d 619, 622, 404 N.E.2d 859, 862.) When the trier of fact in a burglary case decides whether the evidence was sufficient in a burglary case to infer a defendant's intent to commit theft, relevant circumstances it should consider include the time, place, and manner of entry into the premises, the defendant's activity within the premises, and any alternative explanations which may explain his presence. *Richardson*, 104 Ill. 2d at 13, 470 N.E.2d at 1027.

Defendant's challenge on appeal to the sufficiency of the evidence to convict him must fail if *any* rational trier of fact, when viewing the evidence in the light most favorable to the prosecution, could conclude that the State had proved the essential elements of the crime beyond a reasonable doubt. (See *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472-73.) When we consider the evidence in the present case in accordance with this standard, we conclude that the evidence was sufficient to prove the defendant guilty of burglary. The jury could easily have concluded beyond a reasonable doubt that none of the people who entered Central Supply Company on the date in question had any intent other than for defendant to try to steal money from the cash register.

### III. DEFENDANT'S ARGUMENT THAT THE BURGLARY STATUTE UNCONSTITUTIONALLY ALLOWS AN ELEMENT OF THAT OFFENSE TO BE PRESUMED

Defendant next argues that a "Jones burglary" charge is uncon-

stitutional because it provides for a presumption of one of the elements of burglary—entry without authority—once the State has proved that defendant entered with the intent to commit the offense of theft. In support of his argument, defendant cites *People v. Weaver* (1968), 41 Ill. 2d 434, 438-39, 243 N.E.2d 245, 248, wherein the court wrote the following:

> "While a common-law breaking is no longer an essential element of the crime of burglary [citations], the statute requires an entry which is both without authority and with intent to commit a felony or theft. (Ill. Rev. Stat. 1967, chap. 38, par. 19—1.) A criminal intent formulated after a lawful entry will not satisfy the statute. But authority to enter a business building, or other building open to the public, extends only to those who enter with a purpose consistent with the reason the building is open."

(See also *People v. Blair* (1972), 52 Ill. 2d 371, 374, 288 N.E.2d 443, 445 ("authority to enter a business building, or other building open to the public, extends only to those who enter with a purpose consistent with the reason the building is open"); *People v. Bailey* (1989), 188 Ill. App. 3d 278, 288, 543 N.E.2d 1338, 1344; *People v. Drake* (1988), 172 Ill. App. 3d 1026, 1028, 527 N.E.2d 519, 520 ("[d]efendant did not have authority to enter the grocery store to commit a forgery"); *People v. Stager* (1988), 168 Ill. App. 3d 457, 459, 522 N.E.2d 812, 814 ("entry with intent to commit a theft cannot be said to be within the authority granted patrons of a business building"); *People v. Boose* (1985), 139 Ill. App. 3d 471, 473, 487 N.E.2d 1088, 1090, ("[u]nder the 'public building' aspect of burglary, the element of entry without authority need not be established apart from the element of entry with intent to commit a theft").) Based upon this line of authority, defendant argues that application of the burglary statute in a "Jones burglary" case, such as the present one, "compels the mandatory presumption that proof of intent to enter to commit a theft establishes the element of entry without authority. There is simply nothing left for the jury to decide on the issue." We disagree.

■ The short answer to defendant's argument is that nowhere in the jury instructions or in the prosecutor's closing argument do the words "presumption" or "inference" appear. Instead, the jury was properly instructed that the State had to prove beyond a reasonable doubt that defendant's entry into the Central Supply Company was without authority, and the prosecutor argued that he had presented direct evidence to prove that element. On the subject of defendant's authority to enter, the prosecutor argued the following:

"The elements, ladies and gentlemen, there's—the elements of burglary, there are several things that have to be proven. That the Defendant entered the business knowingly, the building knowingly. I think that's obvious that that's been established. That he did so without authority. And you heard Mr. Wells say that he would never have given anyone authority to enter his business for the sole purpose of stealing. And I don't think any businessman or anybody would. If it's your home or it's a business, no one has authority to enter there with the sole intent of committing a theft. I think it's just that clear. \*\*\*

I would also indicate, ladies and gentlemen, that in addition to the first two elements the Defendant, *in addition to entering the building without authority, it had to be with the intent to commit a theft.*" (Emphasis added.)

These quotations from the prosecutor's argument make clear that he argued that the State had met its burden of proof on the element of defendant's lack of authority by presenting direct testimony on that point from Wells. In addition, the emphasized portion of the prosecutor's remarks makes clear that he also informed the jury that the element of defendant's entering without authority was distinct and different from the element of defendant's entry with the intent to commit a theft therein. Accordingly, we reject defendant's argument that he was denied due process because the existence of an element was presumed; instead, we find that the trial court properly instructed the jury on each of the elements the State had to prove beyond a reasonable doubt, and neither the trial court nor the prosecutor said anything to the jury about presumptions which would somehow reduce the State's burden.

### IV. EVIDENCE THAT DEFENDANT HAD BEEN FINGERPRINTED IN ANOTHER COUNTY UNDER ANOTHER NAME

Defendant next argues that the prosecutor improperly presented evidence that defendant's fingerprints were taken in a collateral criminal matter and that he used an assumed name when he had been arrested in an unrelated case. Defendant concedes that he did not object at trial when the State presented this testimony, but he argues we should consider it as plain error under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) because the evidence suggesting other crimes was totally irrelevant and highly inflammatory.

In support of this argument, defendant cites *only* the testimony of Officer McKinley that he had compared defendant's fingerprints with fingerprints "from St. Louis County" that the Bloomington

police department obtained in the name of Ronald Hopkins. McKinley testified that the known prints of Ronald Hopkins matched the prints obtained from defendant. Defendant argues that in Illinois, "evidence of the defendant's fingerprints taken in a collateral matter or evidence of an assumed name is irrelevant since both imply prior criminal conduct." We reject both prongs of defendant's claim and find no error—much less plain error—in receiving McKinley's testimony into evidence.

In support of his argument, defendant cites *People v. Hudson* (1972), 7 Ill. App. 3d 333, 337, 287 N.E.2d 297, 301, for the proposition that testimony about a defendant's fingerprints taken in another matter and on file at the Illinois Bureau of Identification was error because it implied defendant's involvement in other crimes. Although defendant has fairly stated the holding in *Hudson,* we disagree with it and decline to follow that holding. Instead, we agree with two more recent decisions that suggest a trier of fact may infer many different explanations for some governmental agency's having a defendant's fingerprints on file. In *People v. Prewitt* (1987), 160 Ill. App. 3d 942, 949, 513 N.E.2d 977, 982, the court wrote the following:

> "There are a variety of reasons for a police department to have fingerprints on file, for example, fingerprints of crime victims may be on file, as may the fingerprints of security personnel. In addition, in the present case the prosecutor made no references to prior arrests or convictions ***. Because the reference was singular and ambiguous, in that it did not indicate that the defendant had a prior criminal record, we hold that the statement did not constitute reversible error."

In *People v. Gordon* (1981), 94 Ill. App. 3d 764, 767-68, 419 N.E.2d 66, 69-70, the court that authored *Hudson* distinguished it to its limited factual context and wrote the following:

> "It is reasonable to believe that fingerprints may be on file with the police for a number of reasons unrelated to prior criminal activity. For example, fingerprints of crime victims may be on file, as may the fingerprints of security personnel. In addition, in the present case the prosecutor made no references to prior arrests or convictions, nor was the fingerprint card introduced into evidence.
>
> *** The reversal of the defendant's conviction in *Hudson* and remand for a new trial were based on the cumulative effect of several errors. In the present case the only reference to the defendant's prints being on file with the police prior to his arrest for the instant offense was made during the prosecutor's

opening statement. Because the reference was singular and ambiguous, in that it did not clearly indicate that the defendant had a prior criminal record, we hold that its inclusion in the prosecutor's opening statement does not constitute reversible error."

We agree with the above analyses but add the following two points. First, the testimony in the present case did not even cite a police agency as the source of defendant's fingerprints; McKinley's testimony merely indicated that he received a set of fingerprints "from St. Louis County." Trial courts routinely instruct juries, as happened here, that they "should consider all the evidence in the light of your own observations and experience in life." (Illinois Pattern Jury Instructions, Criminal, No. 1.01 (2d ed. 1981).) Surely one of the "common experiences" in life that many jurors have had or know about is that governmental agencies frequently fingerprint persons seeking or obtaining governmental employment. Accordingly, in addition to the reasons discussed in *Prewitt* and *Gordon,* we find defendant's claim that this jury must have concluded that he had a prior criminal record because his fingerprints were on file with "St. Louis County" to be highly speculative and groundless.

Second, as opposed to the holdings in *Prewitt* and *Gordon,* which state that the admissibility of the evidence in those cases "did not constitute reversible error," we emphasize that the presentation of this evidence in this case was *no error at all.* Thus, we need not address defendant's plain error claims.

■ As a last point, we similarly reject defendant's argument that the evidence of his correct name was irrelevant and prejudicial. In support of this argument, defendant cites *People v. Burns* (1988), 171 Ill. App. 3d 178, 187, 524 N.E.2d 1164, 1170, where the court wrote that "evidence adduced at trial solely to raise the inference that the defendant had used assumed names in order to evade apprehension by law enforcement officers for prior criminal offenses is highly prejudicial and improper." *Burns* does not support defendant's claims here because he gave the police a false name not in some prior case, but *in the case on trial,* seemingly to thwart the police investigation in this very case into his background. Although we view the probative value of this evidence as somewhat minimal, we find no error in its admission because we view its prejudicial effect as even less than that.

## V. THE ORDER OF RESTITUTION

■ Defendant last argues that the trial court failed to specify in its sentencing order the number of days of credit on his prison sen-

tence defendant was due for time served in the county jail. The State concedes this point, and we agree. Accordingly, we remand this case to the trial court to conduct a hearing in accordance with the recent decision of this court in *People v. Donnelly* (1992), 226 Ill. App. 3d 771, 779, 589 N.E.2d 975, 980, to determine how much credit for time served defendant is due and to modify the sentencing order accordingly. In all other respects, we affirm the judgment and sentence imposed in this case.

## VI. CONCLUSION

For the reason stated, we affirm the judgment and sentence of the circuit court and remand this case for further proceedings in accordance with the directions set forth herein.

Affirmed and remanded with directions.

KNECHT and COOK, JJ., concur.